# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MICHAEL FRISCHKORN**
Frischkorn Law LLC
Fortville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

**FILED**

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| AUGUSTUS MENDENHALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1104-CR-353 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable William J. Hughes, Judge
Cause No. 29D03-0911-FA-441

**FEBRUARY 27, 2012**

**OPINION - FOR PUBLICATION**

**SHARPNACK, Senior Judge**

## STATEMENT OF THE CASE

Augustus Mendenhall appeals his convictions for Class A felony attempted murder, Ind. Code §§ 35-41-5-1 (1977), 35-42-1-1 (2007); Class A felony robbery resulting in serious bodily injury, Ind. Code § 35-42-5-1 (1984); Class B felony aggravated battery, Ind. Code § 35-42-2-1.5 (1997); Class B felony criminal confinement, Ind. Code § 35-42-3-3 (2006); and Class A misdemeanor resisting law enforcement, Ind. Code § 35-44-3-3 (2006). We affirm in part, reverse in part, and remand.

## ISSUES

Mendenhall raises five issues, which we reorder and restate as:

I.      Whether the trial court abused its discretion by denying Mendenhall's motion for mistrial following an alleged *Doyle* violation.

II.     Whether the trial court erred by allowing the State to present witnesses in rebuttal of Mendenhall's case-in-chief after the testimony of the court-appointed medical witnesses.

III.    Whether Mendenhall was unfairly prejudiced when the trial court permitted the State to present the victim's rebuttal testimony.

IV.     Whether the evidence is sufficient to sustain Mendenhall's convictions for Class A felony attempted murder, Class A felony robbery resulting in serious bodily injury, and Class B felony aggravated battery.

V.      Whether Mendenhall's convictions for Class A felony attempted murder and Class B felony criminal confinement and his convictions for Class A felony robbery resulting in serious bodily injury and Class B felony aggravated battery violate Indiana's prohibition against double jeopardy.

2

Edward DeLaney, an attorney, worked at Barnes & Thornburg from 1973 to 2003.[2] In 1983, while working as a trial lawyer in the firm's real estate department, DeLaney filed a lawsuit on behalf of his client, the DeBartolo Corporation, against Mendenhall's father, Burke Mendenhall, a real estate developer. The DeBartolo Corporation owned Lafayette Square Mall and sold Burke property in the Lafayette Square area. Burke later negotiated a lease to rent the property for up to $90,000 a year to a tenant who planned to open an adult bookstore. The DeBartolo lawsuit sought to prevent the use of the property as an adult bookstore. The trial court issued a restraining order that expired after ten days.

Soon after, Marion County Prosecutor Stephen Goldsmith filed a Racketeer Influenced and Corrupt Organizations action against Burke. The case generated a lot of publicity, and banks began to call in Burke's loans. The lawsuit was not resolved until 1989, after the Supreme Court of the United States had weighed in, *see Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 109 S. Ct. 916, 103 L. Ed. 2d 34 (1989), and Burke and the prosecution had reached a settlement agreement in the state court litigation. In the meantime, Burke had filed a civil suit against Goldsmith alleging that his constitutional rights had been violated. The Seventh Circuit decided the case in Goldsmith's favor in 1995. *See Mendenhall v. Goldsmith*, 59 F.3d 685 (7th Cir. 1995).

---

[1] Mendenhall has filed a Motion for Oral Argument. We deny this motion by separate order issued contemporaneously with this opinion.

[2] When DeLaney joined the law firm, it was called Barnes, Hickam, Pantzer & Boyd.

All of these lawsuits took a toll on Burke and his family. Burke was unable to get mortgage loans and stopped working. Although his net worth in 1983 was five or six million dollars, he eventually went bankrupt. Burke's wife, who had been against leasing the Lafayette Square property to an adult bookstore from the start, eventually divorced him. Following the divorce, Burke provided very little support to his children because all of his money was going toward legal fees.

Burke shared the details of these legal matters and his hatred of DeLaney and Goldsmith with his oldest child, Mendenhall, who was twelve years old when DeLaney first filed the lawsuit on behalf of the DeBartolo Corporation. Mendenhall eventually went to law school, graduated in 2008, and applied for admission to the Indiana Bar. To be admitted, Mendenhall was required to pass a character and fitness interview conducted by a local attorney. Mendenhall was assigned to be interviewed by DeLaney's daughter, Kathleen DeLaney. Kathleen did not know Mendenhall or anything about his father Burke. Mendenhall nevertheless did not think she could be fair to him, was reassigned to a different interviewer, and was eventually admitted to the Indiana Bar.[3] Mendenhall believed that being initially assigned to Kathleen was a sign from God that he had to confront DeLaney or Goldsmith.

In late October 2009, DeLaney received a phone call from a man who identified himself as Victor White. White was later identified as Mendenhall; however, during the interactions between Mendenhall and DeLaney, DeLaney never knew he was dealing

---

[3] Mendenhall has since been permanently disbarred from the practice of law in Indiana. *See In re Mendenhall*, 959 N.E.2d 254 (Ind. 2012).

with Mendenhall or even who Mendenhall was. On the phone, Mendenhall told DeLaney that he represented some Russian businesspeople who had a potential real estate deal in Carmel and that he had been referred to DeLaney as an attorney who could facilitate the transaction. DeLaney responded that he might not be the right person for the job because he did not write leases. However, because he was fluent in Russian and had dealt with foreign businesspeople, he offered to advise them. Mendenhall and DeLaney arranged to meet at 10:00 a.m. on October 31, 2009, at a church on North Meridian Street in Carmel. DeLaney met Mendenhall at the church about five minutes late. DeLaney suggested that they go to a nearby Starbucks to get acquainted, but Mendenhall wanted to see one of the properties first. Mendenhall said that his driver had left him there, so he rode in DeLaney's car.

In the car, Mendenhall told DeLaney that Goldsmith had recommended him. Mendenhall directed DeLaney to Catherine Drive. Catherine Drive had few houses on it and many empty lots. Mendenhall told DeLaney to stop the car so they could talk and look at the empty lots. Soon after DeLaney pulled to the side of the road, Mendenhall reached for his bag and said he was getting DeLaney's retainer. DeLaney told him not to because he did not know enough details to know if he would represent him. Mendenhall reached into the bag, pulled out a plastic bag with a gun in it, and pointed it at DeLaney. Mendenhall asked him if he was right with God. DeLaney responded that his relationship with God was between him and God. Mendenhall then asked him if he had ever used the legal system to hurt people. DeLaney responded that he had not.

5

DeLaney went for the gun with one hand and struck Mendenhall in the head with the other. After a brief scuffle, Mendenhall regained control and put the gun up against the left side of DeLaney's head. DeLaney then felt Mendenhall's hand move and the gun press against his head. Then it happened again. Mendenhall pulled the gun into his lap and "work[ed] on" the bag that contained the gun. Tr. p. 298.

There were two more fights in the car. Each time, Mendenhall overpowered DeLaney and aimed the gun at him. During one of the fights, Mendenhall told DeLaney to give him his wallet and PIN number. DeLaney gave him his wallet and a fake PIN number. A car pulled up after one of the fights. DeLaney recognized the passenger, Kathy Palmer, as a former secretary from Barnes & Thornburg. The driver was her husband. Mendenhall, who had the gun in his lap aimed at DeLaney, told DeLaney that he would kill him if he did not get rid of them. DeLaney explained that he knew the couple and that they would suspect something if he just blew them off. Mendenhall put the gun in DeLaney's back. DeLaney got out of the car and told the Palmers that they were there to look at property to buy. While talking with them, DeLaney kept winking at them and flipping them off with his left hand down by his knee pointed toward the ground, where Mendenhall could not see. After a brief conversation, the Palmers drove away. They knew, however, that something was wrong because DeLaney's gestures were completely out of character. They also knew that none of the property in the area was for sale. They called 911.

Meanwhile, Mendenhall kept the gun trained on DeLaney and directed him to pull the car off the road behind a row of small trees or high bushes. DeLaney got out of the

6

car, and when Mendenhall tried to get out after him, DeLaney slammed the door. Mendenhall got out of the car and tackled him. He pinned DeLaney down by the back tire of the car and started again "working on" the plastic bag that contained the gun. *Id.* at 307. DeLaney was able to see inside the gun and saw that the bullets were misaligned. Mendenhall said that he did not have to kill DeLaney. DeLaney asked him to throw the gun into a mud puddle that was nearby so they could talk. Mendenhall did not toss the gun aside but instead started hitting DeLaney on the right side of the head. DeLaney ended up with his back leaning against the car, and Mendenhall kept "pounding" and "w[ha]ling on" the right side of his head. *Id.* at 308. Mendenhall paused three times but each time resumed striking DeLaney on the right side of the head. DeLaney thought Mendenhall was going to beat him to death.

Officers David Kinyon and James Herron from the Carmel Police Department responded to a call of suspicious activity on Catherine Drive. As they approached the scene, they saw a person beating another person on the ground next to a car. Officer Herron activated the emergency lights and radioed for backup. The patrol car's camera captured the events that followed. The officers exited the vehicle. Mendenhall looked back at them and then fled. While pursuing Mendenhall, Officer Kinyon identified himself as the police and yelled for him to stop several times. Officer Charles Fisher arrived on the scene and also chased Mendenhall. When Officer Kinyon was about eight feet away, Mendenhall looked back and continued running. Officer Kinyon deployed his taser. Mendenhall was struck in the back and fell to the ground. Officer Kinyon

7

deployed the taser two more times because Mendenhall refused to comply with attempts to restrain him and made an aggressive and fast movement toward his waistline.

After Officer Fisher placed Mendenhall in handcuffs, Mendenhall said, "[H]e'll never do that to my family again. Will you just please shoot me. Just kill me." *Id.* at 400. When Officer Kinyon told Officer Fisher to look for a gun, Mendenhall told them that there was a gun in the black bag he dropped when he was struck by the taser. Inside the bag, the officers found a gun, a knife, DeLaney's wallet, a cell phone, and the packaging for a wig and a rain suit. The slide of the gun was partially locked back. Both officers saw a double feed malfunction on the gun where two rounds were caught in the chamber area. Officer Fisher removed the magazine and released the two live rounds that were caught in the chamber area. He did not check whether the safety was on. He then placed the gun in his patrol car until the evidence team arrived. When an evidence technician photographed the gun at the scene, the safety was on. Mendenhall was advised of his *Miranda* rights.

Officer Herron stayed behind to assist DeLaney. When Officer Kinyon later spoke with DeLaney in the ambulance, he saw that DeLaney had severe injuries and heavy bleeding and swelling. His right eye was swollen shut. *Id.* at 311, 379; State's Ex. 3, pp. 1, 2; State's Ex. 4. DeLaney spent two days and two nights at the hospital and was prescribed pain medication upon discharge. He later testified, "I couldn't really see right because my eye was so closed. There was pain around the eye above, below and on the outer edge. All of the right eye. All this is the right eye I'm talking about." Tr. p. 311. His right ear was "all bloody and beaten" and "looked like a piece of liver." *Id.*

8

DeLaney's ribs hurt and he later learned that one of his lungs had been punctured. At the time of the attack, however, all he felt was pain to the right side of his head:

> Everything that I felt was my head. I was so overwhelmed by what was happening in my head that I didn't feel the blows to my ribs. . . . [A]t the time it was all head that I felt. All on this right side of my head.

*Id.* at 312. DeLaney's medical records show that he suffered a slightly displaced right zygomatic arch fracture, a right orbital blowout fracture, rib fractures, a small right pneumothorax, and multiple renal cysts. Other portions of his medical records show that he sustained facial trauma including orbital fractures of the right eye. *See* State's Ex. 3, p. 11.

Officer Jeffrey Laker accompanied Mendenhall to the hospital, where taser barbs were removed from his body. Mendenhall repeatedly asked Officer Laker to shoot him. He also told the doctor that he would have preferred Goldsmith over DeLaney. Detective Gregory Dawson visited Mendenhall at the hospital and spoke briefly with him.

The gun was later examined by Mackenzie Diouf, a forensic firearms examiner with the Indiana State Police Laboratory Division. When Diouf test fired the gun, she found that the gun fired but also had problems cycling. Specifically, on multiple occasions during her tests, the gun had a double feed or failure to extract problem, which Diouf later described in this manner: "The round that is in the chamber did not extract properly therefore when the slide came forward it tried to take another round or cartridge off the top of the magazine and therefore locking the slide in a rearwards position." Tr. p. 517. Diouf indicated that double feeds can occur when the slide is cycled manually or when the gun cycles after being fired.

9

The State charged Mendenhall with Class A felony attempted murder, Class A felony robbery resulting in serious bodily injury, Class B felony aggravated battery, Class B felony criminal confinement, and Class A misdemeanor resisting law enforcement. Mendenhall filed a notice of intent to raise insanity as a defense.

During Mendenhall's jury trial, Detective Dawson testified that he had "some conversation" with Mendenhall at the hospital. *Id.* at 466. When the State asked him about their conversation, he responded, "I read Mr. Mendenhall's Miranda rights and he denied speaking with me without his attorney present." *Id.* Mendenhall objected, received permission to approach the bench, and moved for mistrial based on improper comment on his post-arrest silence as noted in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The motion was argued outside the presence of the jury. The State argued that it did not intend to elicit testimony regarding Mendenhall's silence and that an instruction would cure any error. The State acknowledged the bad question but noted it was trying to elicit testimony regarding Mendenhall's spontaneous statements asking to be shot, which, it argued, could go to the issue of sanity. The trial court denied the motion for mistrial and issued an order in limine preventing the State from making any argument or comment on Mendenhall's right to silence, specifically noting that Mendenhall's use of that right could not be used as evidence of sanity. When the jury returned, the trial court struck Detective Dawson's statement from the record and instructed the jury that it could not be considered for any purpose. No other comment was made on Mendenhall's silence.

10

Mendenhall testified in his own defense that God told him to make things right with DeLaney. He stated that when he first called DeLaney, he implied that he represented the Russian Mafia and that they wanted to buy property in Carmel to use it to launder money. He said that DeLaney had no problems with this and wanted to know how much he would be paid. Mendenhall testified that he only wanted to scare DeLaney and that he did not think the gun worked. He testified that he was not familiar with the gun. Mendenhall also noted in his testimony that he had never read the United States Supreme Court case involving his father.

At the close of testimony on Friday, Mendenhall told the trial court that he planned to call a psychologist and one of Mendenhall's brothers to testify on his behalf on Monday. The trial court noted that its experts would then testify and asked the State whether it anticipated rebuttal after the testimony of the court's experts. The State responded, "I don't anticipate it, but it's definitely possible." Tr. p. 735.

Dr. Solomon Fulero, a psychologist, testified for the defense on Monday. Dr. Fulero testified that he diagnosed Mendenhall with shared psychotic disorder. Specifically, Dr. Fulero stated that Mendenhall suffered a delusion that DeLaney was responsible for his family's problems and that the primary source of that delusion was Mendenhall's father Burke. Dr. Fulero also opined that at the time of the offenses, Mendenhall knew that his actions were legally wrong but believed they were morally justified.

Mendenhall finished presenting his witnesses on Monday morning. The court's experts, Dr. Ned Masbaum and Dr. George Parker, both psychiatrists, were not scheduled

to testify until Tuesday. The State informed the trial court that it had rebuttal witnesses but that they were not available that day. The trial court explained to the jury that there were no more witnesses for the afternoon but that two doctors would testify as court's experts on Tuesday, one at 9:00 a.m. and the other in the afternoon. After the jury was released for the rest of the day, the trial court and the parties discussed final instructions. The State then asked when they could anticipate closing to occur. The trial court was not sure but again noted that one of its experts, Dr. Masbaum, would testify at 9:00 a.m. and that the court was trying to arrange for the second expert, Dr. Parker, to testify later that morning. The State informed the court that its rebuttal would be no longer than a half an hour. Mendenhall then stated, "[The State] has apprised me of some of [its] intended rebuttal. I will be objecting to it if the Court wants to deal with that now." *Id.* at 851. Mendenhall noted that the State intended to call a Westlaw representative as a rebuttal witness and that she was expected to testify that Mendenhall used his Westlaw account in 2008 to access information about insanity. The State corrected Mendenhall by clarifying that the witness was a former Westlaw representative who was expected to testify that Mendenhall asked for her assistance in searching for a case involving his father. The court then asked if the Westlaw representative was the State's only rebuttal witness. The State responded that it also planned to call DeLaney. Mendenhall lodged no other objection.

The next day, the trial court informed the parties that Dr. Parker was not available to testify until the afternoon, but in any event there were matters regarding final instructions that they would need to discuss after Dr. Masbaum's testimony. The jury

12

was brought in, and Dr. Masbaum was introduced as a witness. Dr. Masbaum's report stated that Mendenhall "gave the impression that he never read or studied the legal documents of [Burke's] case." Court's Ex. 2, p. 2. Dr. Masbaum testified that Mendenhall said he implied to DeLaney that he represented the Russian Mafia. As to Mendenhall's sanity, Dr. Masbaum opined that he did not suffer from a severe mental disease or defect for purposes of an insanity defense but that he did have some problems with depression and a personality disorder. Dr. Masbaum also opined that Mendenhall was able to appreciate the wrongfulness of his conduct at the time of his offenses.

After Dr. Masbaum testified, the trial court told the jury that they would be released until Dr. Parker's scheduled testimony that afternoon. The trial court noted to the jury that after Dr. Parker's testimony, rebuttal evidence, if any, would be presented, then closing statements and instructions. Tr. p. 902. The jury returned for Dr. Parker's testimony. Dr. Parker opined that Mendenhall suffered from obsessive compulsive disorder and major depression but that he was able to appreciate the wrongfulness of his conduct at the time of his offenses.

After Dr. Parker's testimony, the jury was given a recess. At this time, Mendenhall objected to any rebuttal evidence outside the scope of the testimony of the court's experts and cited Indiana Code section 35-36-2-2(d) (2004). The trial court overruled the objection based on Indiana Evidence Rule 611, which gives a trial court control over the presentation of evidence.

Victoria Calhoon, the former Westlaw representative, and DeLaney testified on rebuttal. During Calhoon's testimony, Mendenhall lodged a continuing objection

13

challenging the scope of rebuttal. The trial court informed Mendenhall that his continuing objection only addressed improper rebuttal and that any other objection would have to be specifically raised. Calhoon testified that while she and Mendenhall were in law school together, and after she ran a Westlaw training session, Mendenhall asked her about searching for a case by party name and offered his own last name. They pulled up a case involving his father Burke and an adult bookstore.

DeLaney testified on rebuttal after Calhoon. DeLaney testified that Mendenhall never implied that he represented the Russian Mafia. He also testified about his extensive connections with Russia. DeLaney then stated, "I don't [. . .] somebody tried to kill me and I hope nobody's trying to kill my reputation but I will defend what I've done." Tr. p. 975.

The jury found Mendenhall guilty but mentally ill on all counts. The trial court sentenced Mendenhall to thirty years for attempted murder, thirty years for robbery resulting in serious bodily injury, ten years for aggravated battery, ten years for criminal confinement, and one year for resisting law enforcement. The sentences for attempted murder and aggravated battery were ordered to be served consecutively, with all other sentences to run concurrently, for an aggregate term of forty years. Mendenhall filed a motion to correct error, which was denied following a hearing. He now appeals.

DISCUSSION AND DECISION

Mendenhall contends that: (1) the trial court abused its discretion by denying his motion for mistrial following an alleged *Doyle* violation; (2) the trial court erred by allowing the State to present witnesses in rebuttal of his case-in-chief after the testimony

14

of the court-appointed medical witnesses; (3) Mendenhall was unfairly prejudiced when the trial court permitted the State to present DeLaney's rebuttal testimony; (4) the evidence is insufficient to sustain Mendenhall's convictions for Class A felony attempted murder, Class A felony robbery resulting in serious bodily injury, and Class B felony aggravated battery; and (5) Mendenhall's convictions for Class A felony attempted murder and Class B felony criminal confinement and his convictions for Class A felony robbery resulting in serious bodily injury and Class B felony aggravated battery violate Indiana's prohibition against double jeopardy.

## I. MOTION FOR MISTRIAL

Mendenhall first contends that the trial court abused its discretion by denying his motion for mistrial following an alleged *Doyle* violation.  A mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error.  *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001).  A decision on a motion for mistrial lies within the sound discretion of the trial court, and we reverse only upon a showing of an abuse of that discretion.  *Id.*  To prevail, the appellant must show that he was placed in a position of grave peril to which he should not have been subjected.  *Id.*  The gravity of peril is measured by the probable persuasive effect on the jury's decision.  *Oliver v. State*, 755 N.E.2d 582, 585 (Ind. 2001).  The trial judge is in the best position to gauge the surrounding circumstances and the potential impact on the jury when deciding whether a mistrial is appropriate.  *Id.*

Mendenhall moved for a mistrial based on an alleged *Doyle* violation after Detective Dawson stated, "I read Mr. Mendenhall's Miranda rights and he denied

speaking with me without his attorney present." Tr. p. 466. Mendenhall argued that the State would use the invocation of his right to silence to rebut his defense of insanity. *See id.* at 472 ("Judge I think it's clear the State's going to try to use this evidence to show that Mr. Mendenhall had the knowledge of wrongfulness to exercise his privilege to not speak unless he first talked to a lawyer.").

In *Doyle v. Ohio*, the Supreme Court of the United States held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). The Court explained, "[W]hile it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618. "Silence" does not mean only muteness; it includes a statement of a desire to remain silent as well as a desire to remain silent until an attorney has been consulted. *Kubsch v. State*, 784 N.E.2d 905, 914 (Ind. 2003). A jury's knowledge that a defendant initially remained silent is not a problem when that knowledge is not used to subvert the defense in *Doyle* fashion. *Splunge v. Parke*, 160 F.3d 369, 372 (7th Cir. 1998). The rule in *Doyle* also applies to the use of a defendant's post-arrest, post-*Miranda* warnings silence as evidence of sanity. *Robinette v. State*, 741 N.E.2d 1162, 1164 (Ind. 2001) (citing *Wainwright v. Greenfield*, 474 U.S. 284, 295, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986)).

Our Supreme Court has found violations of the rule in *Doyle* where the jury hears evidence of the defendant's silence and that evidence is used to belie a claim of insanity. *See Lynch v. State*, 632 N.E.2d 341, 341 (Ind. 1994) (*Doyle* violation where trial court

16

instructed jury that tape of defendant's initial police interrogation was to be used for the limited purpose of establishing defendant's state of mind soon after the crime and where tape showed discussions regarding defendant's *Miranda* rights and defendant's invocation of his right not to be questioned without an attorney); *Wilson v. State*, 514 N.E.2d 282, 283 (Ind. 1987) (*Doyle* violation where detective testified that defendant indicated he wanted to talk to a lawyer before continuing interview and prosecutor referred to those statements in closing argument to rebut insanity defense: "Shows you that he knew, he understood what [the detective] was saying.").

This case is distinguishable from such cases, however, because Mendenhall's invocation of the right to silence was never used as evidence of his sanity. Although the jury heard Detective Dawson's statement about Mendenhall's silence, that statement was stricken and the jury was admonished, and no other comment was made on Mendenhall's silence. We cannot say that the State used Mendenhall's invocation of his right to silence as evidence of sanity. *See Greer v. Miller*, 483 U.S. 756, 764-65, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987) (no *Doyle* violation where prosecutor asked defendant why he did not tell his story when he was arrested, defense counsel objected and moved for mistrial, trial court denied motion but sustained objection and instructed jury to ignore question, and prosecutor made no other mention of defendant's silence). There is no *Doyle* violation. The trial court therefore did not abuse its discretion by denying Mendenhall's motion for mistrial.

17

## II. ORDER OF WITNESSES

Mendenhall next contends that the trial court erred by allowing the State to present witnesses in rebuttal of his case-in-chief after the testimony of the court-appointed medical witnesses. Specifically, Mendenhall argues that the rebuttal testimony of Calhoon and DeLaney more directly rebutted his own testimony in his case-in-chief than the opinions of the court-appointed medical witnesses, and as a result, the rebuttal testimony was improper under Indiana Code section 35-36-2-2(d). In response, the State argues that Mendenhall has waived this issue.

When a defendant files a notice of insanity defense, the trial court must appoint two or three competent disinterested medical witnesses to examine the defendant and testify at trial. Ind. Code § 35-36-2-2(b); *Crawford v. State*, 770 N.E.2d 775, 778 (Ind. 2002). The testimony of the court-appointed medical witnesses "shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of any medical experts employed by the state or by the defense." Ind. Code § 35-36-2-2(b). The clear purpose of requiring this particular order of proof is to separate the evidence relating to the substantive crime from that related to the issue of sanity. *Crawford*, 770 N.E.2d at 778. Pursuant to Indiana Code section 35-36-2-2(d), the court-appointed medical witnesses "may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of such a medical witness." This opportunity for cross-examination and rebuttal evidence "relieves both parties of the burden of having the court-appointed physicians become their

18

witnesses with the result that they would be bound by such testimony." *Blackburn v. State*, 260 Ind. 5, 291 N.E.2d 686, 698 (1973).

A contemporaneous objection is required to preserve an issue for appellate review. *Bozeman v. State*, 526 N.E.2d 1173, 1174 (Ind. 1988) ("[T]o preserve an alleged error for review, a timely objection must be made."); *see Bald v. State*, 766 N.E.2d 1170, 1172-73 (Ind. 2002) (defendant waived claim of prosecutorial misconduct by failing to make prompt objections at trial). "The overriding purpose of the requirement for a specific and timely objection is to alert the trial court so that it may avoid error or promptly minimize harm from an error that might otherwise require reversal, result in a miscarriage of justice, or waste time and resources." *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009).

We do not reach Mendenhall's claim that the rebuttal testimony of Calhoon and DeLaney was improper under Section 35-36-2-2(d) because he failed to preserve the issue for review. At the close of testimony on Friday, the trial court asked the State whether it anticipated rebuttal after the testimony of the court's experts. The State responded, "I don't anticipate it, but it's definitely possible." Tr. p. 735. After Mendenhall finished presenting his witnesses on Monday morning, the State informed the trial court that it had rebuttal witnesses but that they were not available that day. When releasing the jury for the afternoon, the trial court explained that one of the court-appointed medical witnesses would be the first to testify on Tuesday morning. At this point, Mendenhall knew that a court-appointed medical witness would testify before the State's rebuttal witnesses.

19

Nonetheless, Mendenhall argues that he could not object until he knew the State's witnesses would more directly rebut his case-in-chief than the opinions of the medical witnesses. Specifically, he states, "Trial counsel could not object until after hearing the content of the court-appointed expert testimony and he knew that the anticipated rebuttal testimony was not proper." Appellant's Reply Br. p. 8. This argument is unpersuasive. By Monday afternoon, Mendenhall knew that DeLaney and Calhoon would testify and that Calhoon's testimony would show that Mendenhall had asked for her assistance in searching for his father's case on Westlaw. Mendenhall objected to this testimony, but his objection was not based on the order of witnesses pursuant to Section 35-36-2-2. Mendenhall should have lodged a specific objection under Section 35-36-2-2 but instead waited until after Dr. Masbaum and Dr. Parker testified, when the trial court could no longer adjust the order of witnesses, to do so. *See Mullins v. State*, 646 N.E.2d 40, 48 (Ind. 1995) (noting that timely objection must be made to lack of proper foundation for admission of breath test results and stating that "[a] defendant may not sit idly by while error is committed and later take advantage of it, where a proper objection made at trial could have corrected the error" (quotation omitted)). We therefore conclude that Mendenhall has waived any claim regarding the order of witnesses.

### III. DELANEY'S REBUTTAL TESTIMONY

Mendenhall then contends that he was unfairly prejudiced when the trial court permitted the State to present DeLaney's rebuttal testimony. In that testimony, DeLaney said that Mendenhall never implied that he represented the Russian Mafia, recited his extensive connections with Russia, and stated: "I don't [. . .] somebody tried to kill me

20

and I hope nobody's trying to kill my reputation but I will defend what I've done." Tr. p. 975. Mendenhall argues that this testimony should not have been admitted under Indiana Evidence Rule 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Specifically, Mendenhall argues that because DeLaney's rebuttal testimony was made after the medical testimony on sanity and right before jury deliberations, it was unfairly prejudicial and confused the issues. He asserts that the testimony suggested to the jury an emotional basis for determining questions of guilt and sanity.

At trial, Mendenhall failed to object to DeLaney's testimony on Rule 403 grounds. Failure to object to the admission of evidence at trial generally results in waiver and precludes appellate review unless its admission constitutes fundamental error. *Konopasek v. State*, 946 N.E.2d 23, 27 (Ind. 2011). The fundamental error exception is extremely narrow and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process. *Delarosa v. State*, 938 N.E.2d 690, 694 (Ind. 2010). The error claimed must either make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process. *Id.* This exception is available only in egregious circumstances. *Id.*

We cannot say that DeLaney's rebuttal testimony denied Mendenhall a fair trial or fundamental due process. There was ample evidence establishing Mendenhall's guilt.

21

Indeed, Mendenhall's defense was not that he did not attack DeLaney but that he was insane at the time. Further, there was ample evidence establishing Mendenhall's sanity. Dr. Masbaum and Dr. Parker opined that Mendenhall was able to appreciate the wrongfulness of his conduct at the time of the offenses, and Dr. Fulero, the only other medical expert to testify, opined that Mendenhall knew that his actions were legally wrong at the time of the offenses. DeLaney's rebuttal testimony did not shed any light on Mendenhall's sanity one way or the other. We acknowledge, as did the trial court, that DeLaney's last statement was an emotional reaction to the crimes. However, we see no potential for confusion of the issues or unfair prejudice from this short and isolated statement.[4] We conclude that there is no fundamental error.

## IV. SUFFICIENCY OF THE EVIDENCE

Mendenhall also contends that the evidence is insufficient to sustain his convictions for Class A felony attempted murder, Class A felony robbery resulting in serious bodily injury, and Class B felony aggravated battery. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Treadway v. State*, 924 N.E.2d 621, 639 (Ind. 2010). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We affirm the convictions if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

---

[4] We do not address Mendenhall's response to the State's claim that DeLaney's rebuttal testimony was relevant because the response is based on the order of witnesses issue we have already found waived. Specifically, Mendenhall argues that DeLaney's rebuttal testimony was irrelevant because it did not rebut the opinions of the court-appointed medical witnesses.

22

To convict Mendenhall of Class A felony attempted murder as charged here, the State had to prove beyond a reasonable doubt that Mendenhall "did intentionally engage in conduct, to wit: placed a gun against the head of Edward O. DeLaney and pulled the trigger with the specific intent to kill; said conduct constituting a substantial step toward the commission of the crime of Murder, to wit: intentionally kill another human being, to-wit: Edward O. DeLaney." Appellant's App. p. 245; *see* Ind. Code §§ 35-41-5-1, 35-42-1-1. A conviction for attempted murder requires proof of a specific intent to kill. *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008). Intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury. *Id.*

The evidence most favorable to the verdicts shows that Mendenhall put the gun up against the left side of DeLaney's head, and DeLaney twice felt Mendenhall's hand move and the gun press against his head. Mendenhall then pulled the gun into his lap and "work[ed] on" the bag that contained the gun. Tr. p. 298. DeLaney later saw that the bullets inside the gun were misaligned. When Officers Fisher and Kinyon later recovered the gun, the slide was partially locked back and two rounds were caught in the chamber area. Forensic firearms examiner Diouf concluded that the gun had problems cycling. The jury could reasonably infer from this evidence that Mendenhall twice pulled the trigger of the gun when it was placed against DeLaney's head but that the double feed malfunction prevented the weapon from firing.

Despite this clear evidence, Mendenhall argues that he did not pull the trigger, he did not think the gun worked, and he had an extra cartridge in his bag that he intended to give DeLaney after scaring him. These are merely requests to reweigh the evidence,

23

which we will not do. Further, although Mendenhall argues that the evidence shows that double feeds can occur when the slide is cycled manually and not only when the gun cycles after being fired, it is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007). Mendenhall also argues that the safety was on during the entire incident. Even if the safety was on, Mendenhall testified that he was not familiar with the gun. Thus, the jury could reasonably infer that Mendenhall did not know that the safety was on and had the specific intent to kill when he pulled the trigger. The evidence is sufficient to sustain Mendenhall's conviction for Class A felony attempted murder.

Mendenhall next challenges the sufficiency of the evidence to support his conviction for Class A felony robbery resulting in serious bodily injury. To convict Mendenhall of Class A felony robbery resulting in serious bodily injury as charged here, the State had to prove beyond a reasonable doubt that Mendenhall "did knowingly take property, to-wit: a wallet and its contents from another person, to-wit: Edward O. DeLaney, by using force or by putting Edward O. DeLaney in fear, and said act resulted in serious bodily injury to Edward O. De[L]aney, [e]xtreme [p]ain and/or prot[r]acted loss or impairment of the function of a bodily member or organ, to wit: the eye or ear of Edward O. DeLaney." Appellant's App. p. 245; *see* Ind. Code § 35-42-5-1.

Mendenhall only challenges the element of serious bodily injury. Serious bodily injury includes bodily injury that causes extreme pain or protracted loss or impairment of the function of a bodily member or organ. *See* Ind. Code § 35-41-1-25 (1997). When determining whether a bodily injury is "serious," we exercise considerable deference to

24

the fact-finder. *See Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004); *Whitlow v. State*, 901 N.E.2d 659, 661 (Ind. Ct. App. 2009) ("Whether bodily injury is 'serious' is a question of degree and, therefore, appropriately reserved for the finder of fact."). Nevertheless, such deference is not absolute. *See Davis*, 813 N.E.2d at 1178 (holding that evidence of slightly lacerated lip, abrasion to knee, and broken pinky finger did not establish serious bodily injury). There is no bright line rule differentiating "bodily injury" from "serious bodily injury." *See id.*

The evidence most favorable to the verdicts shows that at the time of the attack, the pain on the right side of DeLaney's head was so great that he did not feel the blows to his body that fractured his ribs and punctured one of his lungs. This evidence is sufficient to show serious bodily injury in the form of extreme pain. As to protracted loss or impairment, Mendenhall argues that DeLaney's medical records "do not plainly and simply state that he had serious injuries to his right eye." Appellant's Reply Br. p. 12. He also argues that there is no evidence that the loss or impairment to DeLaney's right eye was protracted. We disagree. DeLaney testified that Mendenhall kept "pounding" and "w[ha]ling on" the right side of his head. Tr. p. 308. DeLaney's right eye was swollen shut and he felt pain all around that eye. His medical records showed that he suffered a slightly displaced right zygomatic arch fracture and a right orbital blowout fracture. While it is arguable whether it was within the common knowledge of the jury that these medical diagnoses referred to DeLaney's right eye, other portions of his medical records showed that he sustained facial trauma including orbital fractures of the right eye. This evidence is sufficient to show that DeLaney suffered protracted loss or

25

impairment of the function of his right eye. *See Fuller v. State*, 875 N.E.2d 326, 333-34 (Ind. Ct. App. 2007) (serious bodily injury established where defendant struck and kicked victim and pushed victim down flight of stairs, victim suffered blowout comminuted fracture of right eye socket, had bruises, and was given prescription pain medication), *trans. denied*, *superseded by statute on other grounds as stated in Gibbs v. State*, 952 N.E.2d 214 (Ind. Ct. App. 2011). The evidence is therefore sufficient to sustain Mendenhall's conviction for Class A felony robbery resulting in serious bodily injury.

Mendenhall next challenges the sufficiency of the evidence to support his conviction for Class B felony aggravated battery. To convict Mendenhall of Class B felony aggravated battery as charged here, the State had to prove beyond a reasonable doubt that Mendenhall "did knowingly inflict injury on Edward O. DeLaney that caused a protracted loss or impairment of the function of a bodily member, to wit: his right eye or his ear." Appellant's App. p. 246; *see* Ind. Code § 35-42-2-1.5. Mendenhall only challenges the element of protracted loss or impairment. As we concluded above, the evidence most favorable to the verdicts establishes this element beyond a reasonable doubt. The evidence is therefore sufficient to sustain Mendenhall's conviction for Class B felony aggravated battery.

## V. DOUBLE JEOPARDY

Mendenhall finally contends that his convictions for Class A felony attempted murder and Class B felony criminal confinement and his convictions for Class A felony robbery resulting in serious bodily injury and Class B felony aggravated battery violate Indiana's prohibition against double jeopardy. The double jeopardy clause of the Indiana

26

Constitution provides, "No person shall be put in jeopardy twice for the same offense." Ind. Const. art. 1, § 14. Our Supreme Court has held that two or more offenses are the "same offense" in violation of Indiana's double jeopardy clause if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999).

Mendenhall bases his double jeopardy claims on the actual evidence test. Under the actual evidence test, the evidence presented at trial is examined to determine whether each challenged offense was established by separate and distinct facts. *Lee v. State*, 892 N.E.2d 1231, 1234 (Ind. 2008). To show that two challenged offenses constitute the "same offense" in a claim of double jeopardy, a defendant must demonstrate a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense. *Id.* Application of this test requires the court to identify the essential elements of each of the challenged crimes and to evaluate the evidence from the fact-finder's perspective. *Id.* In determining the facts used by the fact-finder to establish the elements of each offense, it is appropriate to consider the charging information, jury instructions, and arguments of counsel. *Id.*

### A. CLASS A FELONY ATTEMPTED MURDER AND CLASS B FELONY CRIMINAL CONFINMENT

Mendenhall first argues that his convictions for Class A felony attempted murder and Class B felony criminal confinement violate the prohibition against double jeopardy.

27

For the Class A felony attempted murder conviction, the State had to show that Mendenhall took a substantial step toward murdering DeLaney by intentionally placing a gun against DeLaney's head and pulling the trigger with the specific intent to kill. *See* Appellant's App. p. 245. For the Class B felony criminal confinement conviction, the State had to show that Mendenhall knowingly confined DeLaney without his consent while armed with the gun. *See id.* at 246. In closing arguments, the State noted the evidence supporting each charge. For attempted murder, the State noted that Mendenhall put the gun against DeLaney's head and pulled the trigger. Tr. p. 1002. For criminal confinement, the State noted that Mendenhall confined DeLaney in the car and also held him on the ground outside the car while he beat him. *Id.* at 1008.

Mendenhall essentially argues that the attempted murder and criminal confinement convictions violate the prohibition against double jeopardy because the charges were premised on the same act of Mendenhall pointing the gun. We disagree. There is no double jeopardy merely because the same weapon was used for both crimes. *See Miller v. State*, 790 N.E.2d 437, 439 (Ind. 2003) ("The repeated use of a weapon to commit multiple separate crimes is not 'the very same behavior' precluding its use to separately enhance the resulting convictions."); *Seide v. State*, 784 N.E.2d 974, 979 (Ind. Ct. App. 2003) ("Though the same weapon may have been involved, it was used six times to commit six offenses.").

Here, an essential element of the attempted murder charge as reflected by the charging information and the State's closing arguments was pulling the trigger while the gun was up against DeLaney's head. This evidence was not presented to support the

28

confinement conviction. Further, the confinement was greater than necessary to accomplish the attempted murder. *See Tackett v. State*, 642 N.E.2d 978, 980 (Ind. 1994) (no error in imposing separate sentences for criminal confinement and murder where the confinement "far exceeded that necessary to accomplish the murder"); *see also Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) ("[W]here the confinement of a victim is greater than that which is inherently necessary to rob them, the confinement, while part of the robbery, is also a separate criminal transgression."). The criminal confinement began when Mendenhall pulled the gun from his bag and ended when he fled the police officers. The attempted murder conviction is based on a brief moment during the confinement when Mendenhall pulled the trigger twice while the gun was aimed at DeLaney's head.

Mendenhall nonetheless argues that his convictions violate double jeopardy because the confinement here was less than an hour while other cases finding no double jeopardy violation involve longer periods of confinement. *See, e.g.*, *Seide*, 784 N.E.2d at 976 (confinement lasted over four hours). We decline to find this distinction relevant here. DeLaney met Mendenhall at the church at about 10:05 a.m. Officers Kinyon and Herron left the crime scene at 10:56 a.m. and followed the ambulance taking DeLaney to the hospital. Appellant's App. p. 43 (probable cause affidavit); Tr. p. 379. The evidence shows that after Mendenhall attempted to murder DeLaney by pulling the trigger, he continued to confine DeLaney while they had two more fights in the car, DeLaney had a conversation with the Palmers, Mendenhall directed DeLaney to pull the car off the road, DeLaney attempted to escape, and Mendenhall tackled him outside the car and beat him. The confinement here, while not lasting hours, clearly extended longer than necessary to

29

accomplish the attempted murder. *See Merriweather v. State*, 778 N.E.2d 449, 455 (Ind. Ct. App. 2002) (robbery and confinement convictions presented no double jeopardy violation where defendant entered restaurant, ordered employee to empty cash registers, and continued to hold employee at gunpoint for nearly fifteen minutes before fleeing).

While we acknowledge that there is some chance that the jury relied on evidence of Mendenhall pointing the gun at DeLaney while pulling the trigger to support the confinement conviction, the relevant question is whether there is a reasonable possibility that the jury did so. Given the manner in which the crimes were charged and argued by the State and given that the confinement was greater than necessary to accomplish the attempted murder, Mendenhall has not demonstrated a reasonable possibility that the jury used the same evidence to establish the essential elements of each offense. Mendenhall's convictions for Class A felony attempted murder and Class B felony criminal confinement do not violate double jeopardy principles.

## B. CLASS A FELONY ROBBERY AND CLASS B FELONY AGGRAVATED BATTERY

Mendenhall then argues that his convictions for Class A felony robbery resulting in serious bodily injury and Class B felony aggravated battery violate the prohibition against double jeopardy. The State elevated the robbery charge to a Class A felony based on "[e]xtreme [p]ain and/or prot[r]acted loss or impairment of the function of a bodily member or organ, to wit: the eye or ear of Edward O. DeLaney." Appellant's App. p. 245. The aggravated battery charge was based on "protracted loss or impairment of the function of a bodily member, to wit: his right eye or his ear." *Id.* at 246.

30

Mendenhall argues that the injury to DeLaney's right eye was used to support the robbery enhancement and aggravated battery. The State concedes that these convictions may violate our prohibition against double jeopardy. That is, there is a reasonable possibility that the jury used evidence of DeLaney's protracted loss or impairment of the function of his right eye to establish the robbery enhancement and aggravated battery. *See Smith v. State*, 881 N.E.2d 1040, 1048 (Ind. Ct. App. 2008) ("It is improper for the State to rely on evidence of the same injury to sustain a conviction for both class A felony robbery and class B felony aggravated battery."). We conclude that the two convictions violate Indiana's double jeopardy clause. When two convictions violate double jeopardy principles, we may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation. *Richardson*, 717 N.E.2d at 54. Reducing the robbery conviction to a Class B felony would still result in a double jeopardy violation in light of Mendenhall's Class B felony criminal confinement conviction. *Compare* Ind. Code § 35-42-5-1 (enhancing robbery to a Class B felony if it "is committed while armed with a deadly weapon"), *with* Ind. Code § 35-42-3-3(b)(2)(A) (enhancing criminal confinement to a Class B felony if it "is committed while armed with a deadly weapon"), *and* Appellant's App. p. 246 (charging information for Class B felony criminal confinement based on Mendenhall being armed with a deadly weapon). We therefore remand with instructions to reduce Mendenhall's robbery conviction to a Class C felony.

## CONCLUSION

For the reasons stated above, we remand with instructions to reduce Mendenhall's robbery conviction to a Class C felony. The trial court is affirmed in all other respects.

Affirmed in part, reversed in part, and remanded with instructions.

BAILEY, J., and BROWN, J., concur.