**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Mar 26 2014, 9:11 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PAUL J. PODLEJSKI**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DONOVAN BALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 48A02-1308-CR-714 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable Thomas Newman, Jr., Judge
Cause No. 48C03-1207-FA-1241

**March 26, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**

At all times relevant to the instant appeal, Appellant-Defendant Donovan Ball was closely associated with members of the Latin Kings gang. During the afternoon hours of June 27, 2012, Ball was with two members of the Latin Kings gang, David Riverez and Ruben Rosales. The three men were driving in a borrowed van when they saw Sergio Torres walking down the street. Torres was a member of a rival gang, the Sorrento 13. Ball, Riverez, and Rosales briefly returned to the residence at which Ball was staying so that Ball could retrieve a baseball bat. The three men then went to find Torres. At that point, an eye witnesses saw Ball get out of the van, approach Torres, and strike Torres multiple times in the head with the baseball bat. Torres was severely injured as a result of the attack. Some of his injuries are permanent.

On July 5, 2012, Appellee-Plaintiff the State of Indiana charged Ball with one count of Class D felony criminal gang activity and one Count of Class A felony attempted murder. The trial court conducted a two-day jury trial on June 25, 2013 through June 26, 2013. Following trial, the jury found Ball guilty as charged. On appeal, Ball contends that the trial court abused its discretion in instructing the jury and in admitting certain evidence during trial. Ball also contends that the evidence is insufficient to sustain his conviction for attempted murder and that the trial court erred in sentencing him to an aggregate executed term of fifty years in the Department of Correction ("DOC"). We affirm.

**FACTS AND PROCEDURAL HISTORY**

At all times relevant to the instant appeal, Ball was closely associated with Rosales

and Riverez, both of whom were in leadership positions of the Latin Kings gang. The Latin Kings gang had an ongoing rivalry with another area gang, Sorrento 13. Torres was a member of Sorrento 13.

During the afternoon hours of June 27, 2012, Ball was with Rosales and Riverez. At approximately 3:50 p.m., the three men were driving in a borrowed brown van when they saw Torres walking down the street. When Ball saw Torres, he stated, "there's one (1) of those Sorrento 13 mother f[*]cker's. [sic]" Tr. p. 250. Ball, Riverez, and Rosales then returned to the residence where Ball was staying so that Ball could retrieve an aluminum baseball bat. Soon thereafter, the three men left the residence.

At approximately 4:00 p.m., Lilliana Cobos-Dominguez observed a brown van driving down her street. From her kitchen window, she observed a man, later identified as Ball, exit the van with an aluminum baseball bat at his side. Another man, later identified as Rosales, also exited the van. Cobos-Dominguez watched as Ball approached a boy, later identified as Torres, who was walking at the end of an alley. Cobos-Dominguez saw Ball strike Torres in the head multiple times with the baseball bat. Ball and Rosales then fled the scene in the van, which was being driven by Riverez.

Cobos-Dominguez called 9-1-1 before helping Torres walk back to her residence to wait for the police to arrive. Anderson Police Sergeant Amber Miller was dispatched to Cobos-Dominguez's residence. Upon arriving, Cobos-Dominguez took Sergeant Miller to Torres. Sergeant Miller observed that Torres had "several lacerations to his head and his right elbow was two (2) to three (3) [times] the size of what it should have been and he had

3

blood all over him." Tr. p. 179. Sergeant Miller requested medical assistance. While waiting for the requested medical assistance to arrive, Torres "started drifting in and out of conscientious [sic]." Tr. p. 180. Sergeant Miller told Torres "to keep his eyes open and [to] keep talking to [her]. Tell [her] who he is, where he lived, what happened." Tr. p. 180. Torres told Sergeant Miller that Ball had battered him.

Torres was subsequently transported to Saint John's Hospital. Sergeant Miller was met at the hospital by Anderson Police Officer Deena Dunn, who observed that Torres "was injured and ill. He spoke very broken and kind of soft. He was coherent but you could tell he was kind of struggling to speak and communicate clearly with us." Tr. p. 198.

Dr. Leonard Bielski, the emergency room physician who treated Torres at Saint John's Hospital, observed that on the Glasgow Coma Scale,[1] Torres's injuries ranked thirteen out of fifteen in terms of severity. Dr. Bielski further observed that Torres "had multiple fractures, in fact the whole right side of his skull was cracked up, essential [sic] like an egg from the trauma … all the bones on the right side of his skull had been cracked." Tr. p. 392. Dr. Bielski noted that it takes "a fair amount of force to fracture the skull. It's pretty well built." Tr. p. 392. Torres also suffered a subdural hemotoma and swelling and inflammation in his skull. Dr. Bielski opined that if untreated, these injuries would have put Torres "at a clear risk for dying." Tr. p. 395. Dr. Bielski further opined that Torres will likely suffer chronic, long-lasting, and even permanent injury.

---

[1] The "Glasgow Coma Scale" is a tool used by the doctors at Saint John's Hospital "to determine how severely a head injury patient has been hurt." Tr. p. 390.

4

Due to the extent of his injures, Torres was transported by helicopter to Saint Vincent's Hospital in Indianapolis. Torres remained hospitalized at Saint Vincent Hospital for seven days following the incident. He also underwent surgery to insert plates into his head, which required an additional two-week hospital stay and two months of post-surgery medical care. Torres still needs an additional surgery on his arm. Further, as a result of his injuries, Torres has a difficult time concentrating and was required to repeat the tenth grade.

Sergeant Miller subsequently went back to Cobos-Dominguez's residence and showed Cobos-Dominguez an array of photographs, including a photograph of Ball. Cobos-Dominguez identified Ball as the perpetrator. Based upon information known to police relating to where Ball resided, officers went to the residence to attempt to apprehend Ball, Rosales, and Riverez. As police approached the residence, Ball fled through a window. Ball was eventually apprehended near Shadyside Park.

On July 5, 2012, the State charged Ball with one count of Class D felony criminal gang activity and one count of Class A felony attempted murder. At trial, the State provided eyewitness testimony that Ball struck Torres multiple times in the head with a baseball bat. Other evidence further demonstrated that Ball retrieved the bat from his bedroom at the residence at which he was staying just prior to the attack on Torres; that Ball was closely associated with Rosales and Riverez, who were in leadership positions of the Latin Kings gang; that Ball wished to be in a leadership position of the gang himself; and that Torres was a member of a rival gang. At the conclusion of trial, the jury found Ball guilty as charged. On July 22, 2013, the trial court sentenced Ball to an aggregate fifty-year executed term of

incarceration.  This appeal follows.

## DISCUSSION AND DECISION

On appeal, Ball contends (1) that the trial court abused its discretion in instructing the jury, (2) that the trial court abused its discretion in admitting certain evidence at trial, (3) that the evidence is insufficient to sustain his conviction for Class A felony attempted murder, and (4) that the trial court erred in sentencing him.  We will address each contention in turn.

## I.  Jury Instructions

Ball contends that the trial court abused its discretion in instructing the jury.

> "The purpose of a jury instruction 'is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict.'" *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001) (quoting *Chandler v. State*, 581 N.E.2d 1233, 1236 (Ind. 1991)).  Instruction of the jury is left to the sound judgment of the trial court and will not be disturbed absent an abuse of discretion.  *Schmidt v. State*, 816 N.E.2d 925, 930 (Ind. Ct. App. 2004), *trans. denied*.  Jury instructions are not to be considered in isolation, but as a whole and in reference to each other. *Id*.  The instructions must be a complete, accurate statement of the law which will not confuse or mislead the jury.  *Id*. at 930-31.  Still, errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise.  *Id*. at 933 (citing *Dill*, 741 N.E.2d at 1233).

*Williams v. State*, 891 N.E.2d 621, 630 (Ind. Ct. App. 2008).

Ball claims that the trial court abused its discretion in instructing the jury because the trial court failed to inform the jury that it must find that he acted with the specific intent to kill Torres in order to find him guilty of attempted murder.  Ball, however, concedes that he did not object to the attempted murder instruction given at trial or tender a proper instruction.  As a result, Ball has waived this issue on appeal.  *See Boesch v. State*, 778 N.E.2d 1276,

6

1279 (Ind. 2002); *Clay v. State*, 766 N.E.2d 33, 36 (Ind. Ct. App. 2002); *Sanders v. State*, 764 N.E.2d 705, 710 (Ind. Ct. App. 2002). On appeal, Ball attempts to avoid waiver of this issue by claiming that the attempted murder jury instruction constituted fundamental error. "The doctrine of fundamental error applies in an extremely narrow set of circumstances." *Sanders*, 764 N.E.2d at 710. "The fundamental error doctrine permits a reviewing court to consider the merits of an improperly raised error if the reviewing court finds that the error was so prejudicial to the rights of the appellant that he could not have had a fair trial." *Id*. at 710-11.

In *Spradlin v. State*, the Indiana Supreme Court adopted a rule of law which requires a jury instruction to state that in order to convict a defendant of attempted murder, the jury must find that the defendant intended to kill the victim while taking a substantial step toward such a killing. 569 N.E.2d 948, 950 (Ind. 1991). "Therefore, an instruction that purports to set forth the elements required for the jury to convict a defendant of attempted murder must include an explanation that the act must have been done with the specific intent to kill." *Sanders*, 764 N.E.2d at 710 (citing *Spradlin*, 569 N.E.2d at 950). However, "[a] reversal of an attempted murder conviction, despite a *Spradlin* error, is not required if either the intent of the perpetrator is not a central issue at trial or the instructions as a whole sufficiently suggested the requirement of the intent to kill." *Id*. at 711 (citing *Ramsey v. State*, 723 N.E.2d 869, 872 (Ind. 2000); *Swallows v. State*, 674 N.E.2d 1317, 1318 (Ind. 1996)). In addition, the Indiana Supreme Court has further held that when determining whether a defendant suffered a due process violation based on an incorrect jury instruction, we look not

7

to the erroneous instruction in isolation but in the context of all relevant information given to the jury, including closing argument and other instructions. *Boesch*, 778 N.E.2d at 1279. "There is no resulting due process violation where all such information, considered as a whole, does not mislead the jury as to a correct understanding of the law." *Id*.

Turning to the instant matter, we note that with respect to the attempted murder charge, the trial court instructed the jury as follows:

> These are your final instructions.… This is a criminal case brought by the State of Indiana. The case was commenced when the State of Indiana filed the following instruction: Information for … Count II, Attempted Murder, a Class A felony. On or about June 27, 2012 in Madison County, State of Indiana, Donovan Warren Ball did intentionally attempt to kill another human being, to wit: Sergio Torres.… The statutes in force at the time the defendant is alleged to have committed the charges [sic] offenses are as follows: … Indiana Code 35-41-5-1, Attempt, reads as follows: a person attempts to commit a crime when, acting with the culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime. An Attempt to commit a crime is a felony or misdemeanor of the same class as the crime attempted. It is no defense that, because of a misapprehension of the circumstances, it would have been impossible for the accused person to commit the crime attempted. Indiana Code 35-42-1-1, Murder, a person who knowingly or intentionally kills another human commits murder a felony.… Intentionally is describe [sic] as: a person engages in conduct "intentionally" if, when the person engages in the conduct, it is the person's conscious objective to so engage in such conduct.

Tr. pp. 477-78, 484.

Initially, we note that Ball correctly asserts that the trial court's instructions to the jury regarding attempt and murder do not specifically state that Ball could only be found guilty of the charge of attempted murder if the State proved that he acted with the specific intent to kill Torres. However, as is stated above, on appeal, we do not look to the allegedly erroneous

8

instruction in isolation but in the context of all relevant information given to the jury, including closing argument and the other instructions. *See Boesch*, 778 N.E.2d at 1279. The State, for its part, argues on appeal that, when read together as a whole, its closing argument coupled with the other instructions given by the trial court make it clear that the jury could only find Ball guilty of attempted murder if it determined that Ball acted with the specific intent to kill Torres. We agree.

Upon review, the record demonstrates that the charging information, which the trial court read to the jury as part of its final instructions to the jury, included that statement that Ball "did intentionally attempt to kill another human being, to wit: Sergio Torres." Tr. p. 477. Further, during closing argument, the prosecuting attorney clearly indicated that in order to find Ball guilty of attempted murder, the jury must find that he acted with the specific intent to kill Torres, stating the following:

> I'm going to move to attempted murder. Now in this the State must prove that the defendant, specifically intended to kill Sergio Torres.… In fact the defendant's own words, you heard the tapes. I don't need to stand up her and try to prove to you that he had intended to kill Sergio Torres. If there had been my pistol, if I had my pistol there wouldn't be no body living. There wouldn't be no living if I had pistol. I'd got the job done. Is there any doubt in your mind? Is there any doubt in your mind? How can there be? … [Torres's] injuries were that severe that he needed to be life lined and that's because this defendant left him in the alley to die.… But anytime you take [a bat] and smash someone's brain in like an egg shell … six (6) or seven (7) times. You intend but nothing to occur other than death. That's your intent. That's your clear intent. You didn't just bash him one (1) time. You intended to get the job done and as a result of that ladies and gentleman this is what we have.

Tr. pp. 446-50. During rebuttal closing argument, the prosecuting attorney again referenced the specific intent to kill, stating the following:

9

The intent to kill, once again straight from his mouth, you heard it on the tape, straight from his mouth. If I had my pistol he'd be dead.… And don't forget really, that is what it comes down to. The only issue in this case is was there an intent to kill. The evidence is overwhelming, just the act alone, the beating of this kid, the severity of the beating is enough alone to show the intent to kill. What else do you have to show the intent to kill? If I had my pistol, I would have shot him. That's specific intent to kill. Remember we talked about how do you find out what intent is? You have to look at the surrounding circumstances, well in this case its even better because he tells you. He told you in the phone conversation, if I would have had my pistol, no one would be alive. That shows that they intended to kill him when they beat him with a baseball bat.… [T]hat is just further intent on top of the already overwhelming evidence of intent to kill in this case.

Tr. pp. 473, 475-76.

The State's closing argument, rebuttal closing argument, and the text of the charging information which was incorporated into the final jury instructions, when considered together as a whole, make it very clear that Ball could only be convicted of attempted murder if the jury found that he acted with the specific intent to kill Torres. Accordingly, we conclude that these arguments and instructions, again when considered together as a whole, do not mislead the jury as to a correct understanding of the law. As such, we further conclude that Ball did not suffer a violation of due process such to warrant a finding of fundamental error.[2] *See Boesch*, 778 N.E.2d at 1279 (providing that there is no resulting due process violation where all such information, considered as a whole, does not mislead the jury as to a correct understanding of the law).

_____

[2] Even though we conclude that, in the instant matter, the failure to instruct the jury regarding specific intent did not amount to fundamental error, we note that the better practice in future cases involving a charge of attempted murder would be to include the requirement that the defendant act with the specific intent to kill in the trial court's instructions to the jury, and to delete the word knowingly from the definition of murder from the trial court's instructions to the jury.

## II. Admission of Evidence

Ball also contends that the trial court abused its discretion in admitting certain evidence at trial in violation of Indiana Evidence Rule 404(b).

> Our standard of review for rulings on the admissibility of evidence is essentially the same whether the challenge is made by a pre-trial motion to suppress or by an objection at trial. *Ackerman v. State*, 774 N.E.2d 970, 974-75 (Ind. Ct. App. 2002), *reh'g denied*, *trans. denied*. We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*. We also consider uncontroverted evidence in the defendant's favor. *Id.*

*Cole v. State*, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007).

A trial court has broad discretion in ruling on the admissibility of evidence. *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003) (citing *Bradshaw v. State*, 759 N.E.2d 271, 273 (Ind. Ct. App. 2001)). Accordingly, we will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id.* (citing *Bradshaw*, 759 N.E.2d at 273). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* (citing *Huffines v. State*, 739 N.E.2d 1093, 1095 (Ind. Ct. App. 2000)).

Ball claims that the trial court abused its discretion in admitting evidence relating to certain telephone calls that he made from the jail telephones while being held in the Madison County Jail prior to trial. Specifically, Ball argues that the challenged evidence was evidence of other crimes, wrongs, or acts alleged to have been committed by Ball, and, as a result, was admitted in violation of Evidence Rule 404(b).

When addressing the admissibility of evidence under [Evidence] Rule 404(b),

11

courts must utilize a two-prong analysis. *Scalissi v. State*, 759 N.E.2d 618, 623 (Ind. 2001). First, the court must assess whether the evidence has some relevancy to a matter at issue other than the defendant's propensity to commit the charged act. *Id.* Second, the court must weigh the probative value of the evidence against its prejudicial effect, pursuant to Evidence Rule 403. *Id.* We will reverse a trial court's determination of admissibility only for an abuse of discretion. *Id.*

*Wages v. State*, 863 N.E.2d 408, 410 (Ind. Ct. App. 2007).

"Evidence Rule 404(b) was designed to assure that 'the State, relying upon evidence of uncharged misconduct, may not punish a person for his character.'" *Lee v. State*, 689 N.E.2d 435, 439 (Ind. 1997) (quoting *Wickizer v. State*, 626 N.E.2d 795, 797 (Ind. 1993)). Evidence Rule 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evid. R. 404(b)(2). In addition, "'[e]vidence of happenings near in time and place that complete the story of the crime is admissible even if it tends to establish the commission of other crimes not included among those being prosecuted.'" *Wages*, 863 N.E.2d at 411 (quoting *Bocko v. State*, 769 N.E.2d 658, 664-65 (Ind. Ct. App. 2002), *trans. denied*). Moreover, Evidence Rule 404(b) does not bar evidence of uncharged criminal acts that are "intrinsic" to the charged offense. *Lee*, 689 N.E.2d at 439. "'Other acts are 'intrinsic' if they occur at the same time and under the same circumstances as the crimes charged.'" *Wages*, 863 N.E.2d at 411 (quoting *Holden v. State*, 815 N.E.2d 1049, 1054 (Ind. Ct. App. 2004), *trans. denied*).

12

## A. Statements Made During Jailhouse Telephone Calls on November 10, 2012 and December 15, 2012

On November 10, 2012, while incarcerated, Ball engaged in a conversation over the jailhouse telephones with Shaylee Murdock regarding Ball's relationship with Rosales. During this conversation, Ball stated the following:

> I don't think you really know what's up man.… I don't think you know what I'm about for real. I'm on a whole another level, you don't even know. You wasn't around the last six (6) months out of that man you weren't even around so you don't know. No body knows. I with [sic] through some whole other shit. I've done changed up for real. I did some stupid shit. [Rosales] and them had me on dumb ass shit. Going to Chicago once every two (2) weeks, went and getting it in. They had me down there on some dumb shit.… Hell man we was winning but I don't know, [f*ck] it. I don't know what's going to happen when I get out of here.

Tr. p. 427. On December 15, 2012, again while incarcerated, Ball engaged in a conversation over the jailhouse telephones with Dustin Rhoades regarding Ball's prior interaction with Sorrento 13. During this conversation, Ball stated the following:

> Man they ain't talking about shit, you don't know what was going on when you got looked up when we was on some dumb ass shit. We'd run around put pistol, put pistols in their mouth all kinds of shit.… Man they put us up with the police one (1) time and talking shit about whip you all so we don't and then they come to the front so we didn't know that there was cops, like (6) cop cars so we came to the back yard and we was walking from like Samantha's house and those [n*gg*r's] the same where we parked, we parked Edgar's truck over there and we walked through the yard and shit. We came through back and they was all in the back we put our pistol on the shit but me and [Rosales] went up in yard and we got pistols to the head and shit and then Smokey said hey police, police, we barely got out. There was like twenty cops coming. We was like damn so we took off running the cops were on me like, I grabbed my arm and I swung, . . . (indiscernible) . . . stop stop so I hit . . . (indiscernible) . . . jumped in the truck and little Jacob that lives over next to my cousin and [Rosales] jumped in the back of the truck I was like no, no, . . . (indiscernible) . . . Movie shit, we was doing some dumb shit though but we were doing all kinds of shit. And then we were driving by down, drive by on Central and we

13

> fell real back and [Rosales's] girl in sisters car, so they went running down on Central and they don't do nothing. We hit the breaks and was what's up bitch, they all took off running.

Tr. pp. 433-34.

Ball claims that the above-stated telephone conversations were inadmissible under Evidence Rule 404(b) because they were entered merely to show Ball's character in order to show that on a particular occasion Ball acted in accordance with his character. The State, for its part, argues that the above-stated telephone conversations were intrinsic to the charged offense of felony gang activity and not offered as character evidence. We agree with the State.

Ball's statements in both the November 10, 2012 and December 15, 2012 conversations indicate that Ball was engaged in criminal gang activity during the relevant time period. These conversations depict acts that allegedly occurred near in time to the June 27, 2012 attack on Torres and help to complete the story regarding Ball's involvement with the Latin Kings gang. Upon review, we find that Ball's statements during both of the above-stated telephone conversations are intrinsic to the charged offense of felony gang activity. Furthermore, Ball has failed to demonstrate that the alleged prejudicial effect of the above-stated conversations outweighed their probative value. As such, we conclude that the trial court did not abuse its discretion in admitting Ball's statements during these conversations into evidence.

### B. Statements Made During Jailhouse Telephone Call on April 22, 2013

On April 22, 2013, again while incarcerated, Ball engaged in a conversation over the

14

jailhouse telephones with Dustin Rhoades regarding whether Rhoades's sister, who happened to be Ball's ex-girlfriend, would testify against Ball at his upcoming trial. During this conversation, Ball stated the following:

> Well I don't know if your sister is going to tell me or not.… Well I go to trial in a month man, They're going to pull her in.… I need to know man.… You don't think she will but maybe man, I need to know what the fuck is up. I ain't talk to her in two (2) and half months though. You need to make sure that she don't say shit.… Tell her I love her. Don't get me locked up for nothing but tell her I love and I need to be out man. What do you mean you don't know if she'll let you. I count on you man, I need, she knows a lot though. . . . (indiscernible) . . . You don't think she know where to get them. She knows everybody.… Yeah she is the key to everything.

Tr. pp. 434-36.

Ball claims that his statements to Rhodes during the April 22, 2013 conversation are irrelevant because they in no way related to any of the charged conduct. The State, for its part, argues that Ball's statements are relevant to demonstrate Ball's guilty knowledge as they effectively amount to threatening and intimidating comments regarding a potential State witness. Again, we agree with the State.

We have previously held that "threats by the accused against prosecution witnesses are considered attempts to conceal or suppress implicating evidence and are 'relevant and admissible into evidence.'" *Matthews v. State*, 866 N.E.2d 821, 825 (Ind. Ct. App. 2007) (quoting *Johnson v. State*, 472 N.E.2d 892, 910 (Ind.1985)). "Such threats are viewed as admissions of guilt and therefore are relevant to demonstrate an accused's guilty knowledge." *Id*. Accordingly, evidence of Ball's seemingly threatening and intimidating statements to Rhoades requesting that Rhoades convince his sister not to testify against Ball were

15

admissible for a purpose other than to merely show his propensity to engage in wrongful acts. Ball has failed to demonstrate an abuse of discretion by the trial court that would support reversal on Evidence Rule 404(b) grounds.

### III. Sufficiency of Evidence

Ball also contends that the evidence is insufficient to sustain his conviction for Class A felony attempted murder.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted). "In essence, we assess only whether the verdict *could* be reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

In order to convict Ball of Class A felony attempted murder, the State was required to prove that on or about June 27, 2012, Ball did intentionally attempt to kill another human

being, to wit:  Torres.  Ind. Code §§ 35-42-1-1, 35-41-5-1.  "A conviction for attempted murder requires proof of a specific intent to kill." *Mendenhall v. State*, 963 N.E.2d 553, 568 (Ind. Ct. App. 2012) (citing *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008)), *trans. denied*. "Intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or serious injury." *Id.*

In the instant matter, the evidence most favorable for the verdict demonstrates that Ball struck Torres in the head multiple times with an aluminum baseball bat.  Ball struck Torres with enough force to crack Torres's skull.  Ball's actions also caused Torres to suffer a subdural hemotoma and swelling and inflammation in his skull.  Dr. Bielski opined that if untreated, these injuries would have put Torres "at a clear risk for dying."  Tr. p. 395.  Dr. Bielski further opined that Torres will likely suffer chronic, long-lasting, and even permanent injury.  Moreover, Ball subsequently made a statement indicating that he wanted to kill Torres, suggesting that Torres was lucky that Ball did not have his pistol on him at the time of the attack "or there would have been a whole different shit and there wouldn't be no liven and shit."  Tr. p. 425.  We conclude that intent to kill can be inferred from these facts as they demonstrate that Ball deliberately used a deadly weapon in a manner that was likely to cause death or serious injury.  *See Osborne v. State*, 754 N.E.2d 916, 925 (Ind. 2001) (upholding defendant's conviction for attempted murder where the defendant struck the victim approximately seven times in the head and face with an iron bar and hammer); *McGee v. State*, 699 N.E.2d 264, 266 (Ind. 1998) (upholding defendant's conviction for attempted murder where the defendant stated that he was going to kill the victim, beat the defendant

17

with a baseball bat, and held the defendant down so that his co-defendant could attack the victim). Ball's claim to the contrary effectively amounts to a request to reweigh the evidence, which we will not do. *See Stewart*, 768 N.E.2d at 435.

## IV. Sentencing Issues

Ball also contends that the trial court erred in sentencing him. In raising this contention, Ball claims that the trial court failed to consider and properly weigh certain mitigating factors. Ball also claims that his fifty-year executed sentence is inappropriate. We will consider each claim in turn.

## A. Abuse of Discretion

Ball claims that the trial court failed to find and accord proper weight to certain mitigating circumstances.

> The finding of mitigating factors is not mandatory and rests within the discretion of the trial court. The trial court is not obligated to accept the defendant's arguments as to what constitutes a mitigating factor. Nor is the court required to give the same weight to proffered mitigating factors as the defendant does. Further, the trial court is not obligated to explain why it did not find a factor to be significantly mitigating. However the trial court may not ignore facts in the record that would mitigate an offense, and a failure to find mitigating circumstances that are clearly supported by the record may imply that the trial court failed to properly consider them.

*Espinoza v. State*, 859 N.E.2d 375, 387 (Ind. Ct. App. 2006) (citations and quotation marks omitted).

Here, Ball argued four mitigating circumstances at sentencing: (1) his young age, (2) his lack of a substantial criminal history, (3) he exhibited remorse, and (4) he played a limited role in the attack on Torres. On appeal, Ball claims that the trial court failed to give proper

18

mitigating weight to his age and lack of a substantial criminal history. Ball also claims that the trial court failed to find his alleged remorse, alleged limited role in the attack on Torres and the fact that he was raised in a broken home to be mitigating.

### 1. Young Age & Lack of a Substantial Criminal History

Ball claims that the trial court abused its discretion in failing to apply appropriate mitigating weight to his young age and his lack of a substantial criminal history. Ball's claim in this regard, however, in unavailable for appellate review. *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *modified on other grounds on reh'g*, 875 N.E.2d 218 (Ind. 2007) (providing that "[b]ecause the trial court no longer has any obligation to 'weigh' aggravating and mitigating factors against each other when imposing a sentence, unlike the pre-*Blakely* statutory regime, a trial court can not now be said to have abused its discretion in failing to 'properly weigh' such factors").

### 2. Remorse

Ball also claims that the trial court abused its discretion in finding that his alleged remorse was not sincere. With respect to Ball's alleged remorse, the trial court, which has the ability to directly observe the defendant and listen to the tenor of his voice, is in the best position to determine whether the remorse is genuine. *Corralez v. State*, 815 N.E.2d 1023, 1025 (Ind. Ct. App. 2004). At the sentencing hearing, the trial court noted Ball's alleged remorse. However, the trial court also alluded to the fact that Ball demonstrated remorse only after his mother advised him to show remorse. Because the trial court was in the best position to directly observe Ball to determine whether his alleged remorse was genuine, we

will not disturb the trial court's determination that this was not a significant mitigating factor. *See id*.

### 3. Alleged Limited Role in Attack on Torres

Ball next claims that the trial court should have considered his alleged limited role in the attack on Torres to be a mitigating factor. The record, however, does not support the claim that Ball played a limited role in the attack on Torres. Rather, the record demonstrates that Ball retrieved the aluminum baseball bat from his bedroom, sought out Torres, and beat him in the head multiple times with the baseball bat.

Again, the finding of mitigating factors is within the discretion of the trial court, and the trial court is not obligated to accept the defendant's contentions as to what constitutes a significant mitigating factor. *McCann v. State*, 749 N.E.2d 1116, 1121 (Ind. 2001) (citing *Legue v. State*, 688 N.E.2d 408, 411 (Ind. 1997)). "'An allegation that the trial court failed to identify or find a mitigating [factor] requires the defendant to establish that the mitigating evidence is both significant and clearly supported by the record.'" *Id*. (quoting *Carter*, 711 N.E.2d at 838). Ball has failed to do so. As such, the trial court did not abuse its discretion in failing to find Ball's alleged limited role in the attack on Torres to be a mitigating factor.

### 4. Raised in Broken Home

Ball also claims that the trial court should have considered the fact that he was raised in a broken home to be a mitigating factor. Ball, however, did not raise this claim before the trial court. "'A defendant who fails to raise proposed mitigators at the trial court level is precluded from advancing them for the first time on appeal.'" *Johnson v. State*, 837 N.E.2d

20

209, 215 (Ind. Ct. App. 2005) (quoting *Pennington v. State*, 821 N.E.2d 899, 905 (Ind. Ct. App. 2005)). Therefore, Ball has waived this claim on appeal.

In sum, from our review of the record, we are convinced that the trial court considered all evidence of the alleged mitigating factors presented during the sentencing hearing by Ball. The trial court made a clear sentencing statement recognizing all mitigating factors argued by the parties. Again, a trial court has discretion to find mitigating circumstances and, absent an abuse of discretion, this court will not remand for resentencing. *See Hardebeck v. State*, 656 N.E.2d 486, 493 (Ind. Ct. App. 1995), *trans. denied*. Ball has not shown an abuse of discretion in this regard.

## B. Appropriateness of Sentence

Ball also challenges his sentence by claiming that it is inappropriate in light of the nature of his offense and his character. Indiana Appellate Rule 7(B) provides that "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In analyzing such claims, we "'concentrate less on comparing the facts of [the case at issue] to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Paul v. State*, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008) (quoting *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans. denied*). The defendant bears the burden of persuading us that his sentence is inappropriate. *Sanchez v. State*, 891 N.E.2d 174, 176 (Ind. Ct. App. 2008).

21

In claiming that his sentence is inappropriate, Ball argues that the trial court's order that his entire fifty-year sentence be executed in the DOC renders his sentence inappropriate. We note that we have previously determined that it will be quite difficult for a defendant to prevail on a claim that the placement of his sentence is inappropriate. *King v. State*, 894 N.E.2d 265, 267 (Ind. Ct. App. 2008) (citing *Fonner v. State*, 876 N.E.2d 340, 343 (Ind. Ct. App. 2007)).

> This is because the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. [*Fonner*, 876 N.E.2d at 344]. A defendant challenging the placement of a sentence must convince us that the given placement is itself inappropriate. *Id*. As a practical matter, trial courts know the feasibility of alternative placements in particular counties or communities. *Id*. at 343. For example, a court is aware of the availability, costs, and entrance requirements of community corrections placements in a specific locale. *Id*. at 343-44.

*Id*. at 268 (emphasis in original).

Ball does not provide any argument regarding what he believes would be a more appropriate placement on appeal. Instead, he argues that the length of his executed sentence is inappropriate. We cannot agree.

With respect to the nature of Ball's offense, the record demonstrates that Ball engaged in criminal gang activity. The record further demonstrates that Ball retrieved the aluminum baseball bat from his bedroom, sought out Torres, and beat him in the head multiple times with the baseball bat. Ball then fled the scene, leaving Torres injured in an alley. Torres suffered serious injuries as a result of the attack which could likely have resulted in his death without timely medical attention. In addition, Torres will likely suffer chronic long-term, if

not permanent, injury as a result of the attack.

With respect to Ball's character, the record demonstrates that Ball did not appear to be genuinely remorseful for his actions and indicated that he had no desire to alter his lifestyle if released from prison. Ball also indicated that he planned to flee to Mexico if he could convince anyone to pay his bail. In addition, while Ball did not have a substantial criminal history, he was on juvenile probation at the time he committed the instant offense. Upon review, we conclude that Ball has failed to meet his burden of proving that his fifty-year executed sentence is inappropriate.

## CONCLUSION

In sum, we conclude that (1) the trial court did not abuse its discretion in instructing the jury, (2) the trial court did not abuse its discretion in admitting the challenged evidence at trial, (3) the evidence is sufficient to sustain Ball's conviction for Class A felony attempted murder, and (4) the trial court did not err in sentencing Ball. Accordingly, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

RILEY, J., and ROBB, J., concur.