**Manuel Tyrone MILES, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 48A02–0202–CR–141.**

Court of Appeals of Indiana.

Nov. 1, 2002.

---

**2.** Our opinion does not address whether the offer of policy limits may defeat underinsured motorist coverage.

Mark Maynard, Decker, Lawyer & Maynard, Anderson, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy At-

torney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Manuel Tyrone Miles (Miles), appeals his convictions for Count I, burglary resulting in bodily injury, a Class A felony, Ind.Code § 35–43–2–1; Count II, battery resulting in serious bodily injury, a Class C felony, I.C. § 35–42–2–1(A)(3); Count III, rape, a Class A felony, I.C. § 35–42–4–1(A)(1); Counts IV VII, criminal deviate conduct, Class A felonies, I.C. § 35–42–4–2(A)(1); Count VIII, criminal confinement, a Class B felony, I.C. § 35–42–3–3(1); and Count IX, attempted armed robbery, a Class B felony, I.C. 35–42–5–1(1), I.C. § 35–41–5–1.

We affirm.

### ISSUES

Miles raises three (3) issues on appeal, which we restate as follows:

1. Whether the trial court erred in admitting statements made to witnesses by the victim, which repeated her version of the events that occurred on August 26, 2001.

2. Whether the trial court erred in excluding as hearsay the information shown on the caller identification box.

3. Whether the trial court properly sentenced him.

### FACTS AND PROCEDURAL HISTORY

On August 26, 2001, Treva Swift (Swift) awoke to someone knocking at the side door of her house. Swift went to the front door and waited because the side door was not a regular entrance into the house. Eventually, Smith heard someone knocking at the front door. She said, "Who is it?" (Tr. p. 209). When no one answered, Smith repeated the question and thought the person knocking could not hear her, so she opened the door in order to see who was knocking. As soon as she cracked the door open, a man forced his way inside of the house.

The man was wearing a bandanna over the lower portion of his face. He entered the house and shut the door behind him. The man pushed Swift down onto the couch and ordered her to remove her clothes. Swift testified that, despite the bandanna, she recognized the man as Miles due to his distinctively light-colored eyes and his voice. Swift knew Miles because he lived in her neighborhood.

Swift screamed and cried because Miles was armed with a gun. Miles ordered Swift to "shut up," and when she did not comply, he struck her in the head with the gun. (Tr. pp. 212 13). The gun discharged as he struck her in the head. When Swift felt the blood on her forehead, she believed that she had been shot and stated, "You shot me, you shot me." (Tr. p. 214). Miles continued to order her to remove her clothes.

As Swift undressed, she told Miles that she had children. Miles remained unsympathetic and demanded that Swift perform fellatio on him. After balking at the command, Swift obeyed. Miles then grabbed her by her arms and ordered her to show him to her bedroom. Once in the bedroom, Miles asked for a condom. Swift was hesitant to comply, but she eventually retrieved a condom and followed his orders to put the condom on him. He also ordered her to cover her face. Thus, Swift found a sock and placed it over her face to cover her eyes. While holding the gun, Miles proceeded to engage in sexual intercourse with her. During this time, the sock fell off of Swift's face. As a result, Miles took her glasses off and tied a pil-

lowcase around her head so she could not see him.

Miles then ordered Swift to perform fellatio on him again. Afterward, he turned her over and asked if she had ever had anal sex. Subsequently, he engaged in anal intercourse with Swift. When he was finished, he forced Swift to perform fellatio on him for a third time. At this point, Swift noticed that the condom was broken. Miles, still armed with the gun, instructed Swift to sit on his face. As Swift complied, she was able to see Miles' "completely exposed" face from under the pillowcase tied around her head. (Tr. p. 228–29).

Swift asked Miles if she could leave to pick up her children. Miles stated that she could go when she was finished doing what he told her to do. Miles then demanded that Swift lick his scrotum. Swift hesitated and Miles threatened, "You're gonna do it or you ain't gonna see your kids no more." (Tr. p. 230). Therefore, Swift obeyed. Subsequently, Miles ordered Swift to lick his anus. She protested, but he forced her to obey his command. Afterward, Swift asked if she could leave, but Miles forced her to submit to sexual intercourse again.

Miles then ordered Swift to go to the bathroom and wash herself. He stood nearby and watched her as she washed up. Miles expressed concern that Swift's head wound may have been a gunshot wound. At this time, Swift heard him leave the bathroom so she lifted the pillowcase blindfold and saw Miles in her bedroom with the gun pointed at his head. Miles stated, "I'm about to shoot myself." (Tr. p. 238). Swift ran to the front door but stopped because she was afraid that Miles was following her. She stood in her front room and closed her eyes. When she opened her eyes, Miles was standing in front of her. Swift immediately covered her eyes, but Miles stated, "You seen me,

you seen me, I'm gonna kill you." (Tr. p. 239).

Miles forced Swift to return to the bedroom and ordered her to remove the bedding in order to clean it in the bathtub. Then, Miles guided Swift back into the living room where she retrieved her clothes. He asked for money and when she said she did not have any money he preceded to take her clear blue Walkman with a Young Bleed tape inside of it. Finally, Miles left Swift's house, but before he left, he cut her telephone cord. Swift immediately got dressed and drove to a friend's house. After speaking with her friends, Swift went to the hospital. The laceration on her head required sutures to close, and a sexual assault examination was performed. While at the hospital, Swift talked with the police. Based on her description, Miles was apprehended and taken to the Anderson Police Department. At the police department, Miles videotaped a statement denying any involvement in the incident and claiming to have been at home in bed.

The police went to Swift's home and found the severed telephone cord. They also went to Swift's home and found a bullet hole in a cushion on the couch and another bullet hole in the carpet. The bullet was recovered from underneath the carpet. The following day, the police obtained a search warrant for the home that Miles shared with his grandmother, Carolyn Clay (Clay). During the search, the police found Swift's clear blue Walkman with the Young Bleed tape inside of it in the bottom of Miles' closet.

Accordingly, the State filed an information charging Miles with the following: Count I, burglary; Count II, battery resulting in serious bodily injury; Count III, rape; Count IV–VII, criminal deviate conduct; Count VIII, criminal confinement; and Count IX, attempted armed robbery.

On November 27, 2001, a jury trial was held. On the same date, the jury found Miles guilty as charged on all counts. On December 17, 2001, Miles was sentenced to the Indiana Department of Correction for a total of 270 years: (50) years on Count I, eight (8) years on Count II, fifty (50) years on Count III, fifty (50) years on Count IV, fifty (50) years on Count V, fifty years (50) on Count VI, fifty (50) years on Count VII, twenty (20) years on Count VIII, and twenty (20) years on Count IX. Counts I, II, III, and VIII were ordered to run concurrently and Counts IV, V, VI, VII and IX were ordered to run consecutively.

Miles now appeals.

## DISCUSSION AND DECISION

### I. Admission of Hearsay Evidence from Witnesses

Miles argues that the trial court erred by admitting into evidence statements made to witnesses by Swift, which repeated her version of the events that occurred on August 26, 2001. Specifically, he maintains that the trial court improperly admitted testimony from the following witnesses: Kathy Lakas (Lakas), the sexual assault nurse; Dr. Shuree Dersum (Dr. Dersum); Nakia Love (Love); and Vannessa McDade (McDade).

Here, we find that any claim of error was waived because defense counsel failed to object to the admission of the statements at trial. "Failure to object at trial waives any claim of error and allows otherwise inadmissible hearsay evidence to be considered for substantive purposes and to establish a material fact at issue." *Johnson v. State,* 734 N.E.2d 530, 532 (Ind. 2000). Thus, Miles' claim of hearsay is unavailable for our review.

Waiver notwithstanding, we find that the State did not present a "drumbeat repetition" of improper hearsay. Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). However, a hearsay statement is admissible if one of the hearsay exceptions applies. *McIntyre v. State,* 717 N.E.2d 114, 120 (Ind.1999).

In the instant case, a hearsay exception applies to the testimony of Lakas and Dr. Dersum. Evid. R. 803(4) provides that statements made to medical personnel for the purpose of obtaining a diagnosis and treatment are admissible. This exception to the hearsay rule is based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant would mislead the medical personnel person she wants to treat her. *McClain v. State,* 675 N.E.2d 329, 331 (Ind.1996). Here, the State offered testimony from Lakas and Dr. Dersum concerning Swift's physical and emotional appearance. They testified, without objections, to statements made to them by Swift about her condition. Clearly, Lakas and Dr. Dersum are medical professionals who examined and treated Swift following her attack. Thus, we find that their testimony is admissible under Evid. R. 803(4).

Furthermore, we find that even if Miles raised a timely objection, the testimony of Love and McDade fails to warrant a reversal of his convictions. Love testified that Swift told her about the various sex acts that Miles ordered her to perform. McDade testified about the identity of Swift's attacker. Therefore, we hold that the testimony of Love and McDade was brief and consistent with the longer and more detailed testimony of Swift. Thus, no reversal is warranted. *See McGrew v. State,* 673 N.E.2d 787 (Ind.Ct. App.1996), *trans. granted, reversed on other grounds.*

## II. *Exclusion of Evidence was Harmless Error*

Next, Miles argues that the trial court erred in excluding, as hearsay, the information shown on the caller identification box of his girlfriend, Roland Skates (Skates).

■ In the present case, the State immediately objected before Skates testified to an anticipated portion of her testimony. Specifically, the State objected to testimony concerning information shown on Skates' caller identification box on the ground that it was hearsay. As a result, Miles' counsel made an offer of proof outside of the jury's presence. During the offer, Skates stated that between 4:00 a.m. and 4:30 a.m. on August 26, 2001, she received a telephone call from Miles and her caller identification box showed that it originated from the residence that he shared with Clay. The State renewed its objection to the evidence from the caller identification box by claiming that it constituted hearsay. The trial court agreed with the State and sustained the objection. Accordingly, Miles was prohibited from questioning Skates about the caller identification box information.

There is no Indiana case law that addresses the admissibility of information from a caller identification box. The only Indiana case that even mentions the device is *Johnson v. State*, 734 N.E.2d 530, 532 (Ind.2000). In *Johnson*, our supreme court mentions the caller identification box in a footnote. However, the appellate court in Virginia found that the information from a caller identification box is not hearsay because "there is no out-of-court asserter. The caller identification box is based on computer-generated information and is not simply the repetition of prior recorded human input or observation." *Tatum v. Commonwealth*, 17 Va.App. 585, 588, 440 S.E.2d 133, 135 (1994). Conse-

quently, we find that the trial court improperly excluded the information from the caller identification box as hearsay.

Nonetheless, the exclusion of the caller identification box information from Skates' testimony does not warrant a reversal of Miles' convictions. Under Ind. Trial Rule 61, any error in the exclusion of evidence is not grounds for reversal unless it is inconsistent with substantial justice and affects the substantial rights of the parties. Moreover, the error is harmless if the evidence of guilt was overwhelming and the defendant was allowed to present his defense even if not as completely as he desired. *See Whited v. State*, 645 N.E.2d 1138, 1140 (Ind.Ct.App.1995). Here, the evidence against Miles was overwhelming. Miles and Swift lived in the same neighborhood and had spoken with each on several occasions. Swift was able to identify Miles as her attacker because of his light-colored eyes, his voice, and the fact that she saw his face completely exposed at least two (2) times during the attack. The record also reflects that Swift's clear blue Walkman was taken by Miles after the attack and found in his closet by the police the day after the attack. Clearly, the exclusion of a portion of Skates' testimony fails to mandate a reversal of Miles' convictions. We find that the excluded evidence would have had little, if any, impact on the evidence against Miles. The record indicates that Miles lived "around the corner" from Swift. (Tr. p. 201). Miles claimed that he was at home at 4:00 a.m. and that he called Skates around that time. Skates confirmed that Miles called her between 4:00 a.m. and 4:30 a.m. Thus, the excluded portion of Skates' testimony would have only been cumulative to the evidence already presented to the jury. Therefore, we find that any error by the trial court in excluding the information from the caller identification box as hear-

say was harmless because Miles was able to place his defense before the jury. *Whited,* 645 N.E.2d at 1140.

### III.  *Sentencing*

Finally, Miles argues that he was improperly sentenced.  Specifically, Miles contends that the trial court erred when it failed to recognize all of the proffered mitigating factors when imposing the maximum allowable sentence of 270 years.

■ Sentencing decisions are within the trial court's discretion and are reversed only upon a showing of manifest abuse of discretion.  *Gibson v. State,* 702 N.E.2d 707, 710 (Ind.1998), *reh'g denied, cert. denied.*  Ind. Appellate Rule 7(B) provides: "[t]he Court shall not revise a sentence authorized by statute unless the statute is manifestly unreasonable in light of the nature of the offense and the character of the offender."

■ When imposing an enhanced sentence, the trial court must (1) identify all significant aggravating and mitigating circumstances;  (2) state the specific reason why each circumstance is determined to be mitigating or aggravating;  and (3) articulate the trial court's evaluation and balancing of the circumstances.  *Like v. State,* 760 N.E.2d 1188, 1191–92 (Ind.Ct. App.2002), *reh'g granted on other grounds.* A single aggravating circumstance is sufficient to support the imposition of an enhanced sentence.  *Noojin v. State,* 730 N.E.2d 672, 678 (Ind.2000).  Moreover, an enhanced sentence may be imposed when the only aggravating circumstance is the defendant's prior criminal history.  *Isaacs v. State,* 673 N.E.2d 757, 765 (Ind.1996). Additionally, this court has determined that the consideration of mitigating circumstances is not mandatory when sentencing a criminal defendant.  *Neuhausel v. State,* 530 N.E.2d 121, 124 (Ind.Ct.App. 1988).  It is the discretion of the trial court

whether to consider possible mitigating circumstances and the weight they should be given.  *Id.* A trial judge is not required to accept as true all of the mitigating factors presented by the defendant. *Hampton v. State,* 719 N.E.2d 803, 808 (Ind.1999).  Because the sentencing is inherently subjective, we do not substitute our own judgment for that of the trial court.  *Hurt v. State,* 657 N.E.2d 112, 114 (Ind.1995).

■ In the instant case, Miles claims that the trial court failed to consider all of the proffered circumstances.  Specifically, Miles maintains that the trial court failed to consider:  (1) the testimony of Miles' aunt, Jacqueline Myers, who offered evidence that Miles seemed to be getting his life together because he was kind-hearted and very protective of his sisters;  (2) the testimony of Miles' grandmother, Clay, who stated that in spite of his problems Miles was becoming responsible because he was employed and was preparing to earn his GED;  (3) the fact that Miles turned nineteen (19) years old just two (2) days prior to this incident;  and (4) the pre-sentence investigation report which disclosed that Miles had a troubled youth. In particular, the report indicated that Miles frequently moved while he was growing up because his mother was unable to raise him due to her incarceration.

Conversely, the State maintains that the trial court considered all the mitigating factors offered by Miles, but simply did not agree with them.  The State also points out that the trial court was not obligated to consider any mitigating factors when sentencing Miles.

We find that the trial court considered the proffered mitigators and while acting within its discretion, rejected them.  *See Hampton,* 719 N.E.2d at 808;  *Neuhausel,* 530 N.E.2d at 124.  Furthermore, the trial court properly enhanced Miles' sentence

by identifying multiple aggravating factors. Specifically, the trial court noted Miles' prior criminal history as a juvenile which included multiple batteries, burglaries, resisting law enforcement, theft, incorrigible, and criminal mischief. Miles also was convicted as an adult for domestic battery and resisting law enforcement. The trial court further found that at the time of this crime Miles was participating in a diversion programs. Moreover, the trial court noted, "this crime was particularly heinous and brutal. A gun was discharged. A gun was used. Physical violence was engaged." (Tr. p. 540). The trial court determined that in light of Miles' criminal history and his present actions there was a likelihood of re-offending, which justifies aggravating circumstances. Finally, the trial court concluded that Miles had "a classic anti-social sociopathic personality, which definitely needs correctional and rehabilitative treatment that can best be served by an extended period of incarceration." (Tr. p. 540).

With the above in mind, we conclude that the trial court properly sentenced Miles. The trial court could have enhanced Miles' sentence on his prior criminal history alone. *See Isaacs,* 673 N.E.2d at 765. The trial court was not required to accept the proffered mitigating circumstances, as presented by Miles, as true. *See Hampton,* 719 N.E.2d at 808. In fact, the trial court was not required to find the existence of mitigating circumstances at all. *See Neuhausel,* 530 N.E.2d at 124. Consequently, we cannot find that Miles' sentence is manifestly unreasonable or improper.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly admitted the testimony of Lakas, Dr. Dersum, Love, and McDade. Further, we conclude that

the exclusion of the information from the caller identification box was harmless error. Lastly, we conclude that the trial court properly sentenced Miles.

Affirmed.

MATTINGLY–MAY, J., and ROBB, J., concur.