## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2015, 9:41 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Timothy J. O'Connor
O'Connor & Auersch
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Samuel Bellamy, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | August 31, 2015 <br><br> Court of Appeals Case No. <br> 49A05-1412-CR-562 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Lisa F. Borges, Judge <br><br> The Honorable Anne M. Flannelly, Magistrate <br><br> Trial Court Cause No. <br> 49G04-1205-FC-35056 |

**Brown, Judge.**

[1] Samuel Bellamy appeals from his convictions for strangulation and domestic battery as D felonies. He raises one issue which we revise and restate as whether the trial court abused its discretion in admitting certain evidence. We affirm.

## Facts and Procedural History

[2] On the evening of April 22, 2012, Sara Bellamy ("Sara") was in the one-bedroom apartment she shared with Bellamy, her husband of approximately three years. Earlier that day, Bellamy had been at his mother's home doing laundry and watching basketball. While there, he and Sara exchanged text messages, including some sent by her "in regards to him being gone so long." Transcript at 49.

[3] He returned to the couple's apartment sometime around 10 p.m. that evening. Sara had expected him home earlier, and she "had an issue" with him coming home at such a late time. *Id.* at 78. Anticipating that he would have been home at "the normal time," Sara had prepared dinner for him, and it was cold by the time he arrived. *Id.* He was upset that she had "went ahead and made dinner instead of waiting until he got home." *Id.* at 80. He was also "angry with the fact that [Sara] didn't go downstairs and help him bring up the laundry." *Id.* at 48. While discussing the tone of Sara's earlier text messages, Bellamy expressed to her that he thought she was being sarcastic or "slick." *Id.* at 49. When she attempted to show him the text messages on her phone and explain that wasn't "what [she] was intending to say or sound like," Bellamy began "yelling and screaming" in her face, and he was "so angry that he was

spitting and you could feel his spit hitting your face." *Id.* at 49-50. At some point, he punched her in the stomach, causing her to scream and ask him to leave. *Id.* at 51. According to Sara, Bellamy said that he was going to leave, but he remained in the apartment. She then began to gather some clothes to leave, but, as she started to make her way out, Bellamy grabbed her by her hair and pulled her back, causing her to fall to the floor. While she was on her back on the floor, Bellamy "got on top of [her] and placed both hands around [her] neck and began to choke [her]." *Id.* at 54. When he removed his hands from her neck, they continued arguing, she "continued to yell for help," and he punched her in the eye. *Id.* at 57.

[4]     Johnathan Griffin, who lived in the apartment below them, heard a woman "screaming and pleading. But it sounded like pleading for her life or pleading for someone to stop." *Id.* at 24-25. He also heard a male's voice and "things slamming around . . . like people running through the apartment, a woman trying to get away." *Id.* After hearing this, Griffin called 911, and then called 911 a second time because "it was so severe, it was going on for so long, [he] was afraid for her life." *Id.* at 25.

[5]     Eventually, Bellamy packed several bags and began to leave the apartment. When he opened the front door, a police officer was immediately outside the door. While remaining in the doorway, Bellamy allowed the officer to enter the apartment. The officer made contact with Sara, who was standing approximately fifteen feet from the front door. The officer asked Sara if "everything was okay," and she said "yes." *Id.* at 67. After the officer finished

speaking with Sara, he turned to Bellamy and spoke with him briefly, and Bellamy left in his car.

[6] Sara spent the night in the apartment. She went to work the next morning, but left early to seek treatment at Wishard Hospital. Starting off in the emergency room, she was examined by a doctor and had x-rays taken. After being examined by the doctor, she was taken to another area of the hospital where Jenny Lee ("Nurse Lee"), a registered nurse who is certified as a Forensic Nurse Examiner, continued examining her and took pictures. They discussed filing a police report, but Sara did not make a report at that time.

[7] On April 25, 2012, at approximately 4 a.m., Sara reported the incident to the Indianapolis Metropolitan Police Department. The majority of her approximately three minute phone call consisted of her providing information such as her name and address. Around forty seconds of the call consisted of Sara explaining that a police officer had come to her apartment the night of April 22, 2012, but that she had not said anything to him because she was afraid, that her injuries had been diagnosed at Wishard Hospital, and that Bellamy had caused the injuries by strangling her. Following her phone call to the police, Officer Rasheed Muwallif was dispatched to speak with Sara at her apartment. During the ensuing meeting concerning the events of April 22, 2012, Sara appeared "very nervous" and "[h]er whole body was shaking." *Id.* at 35. Officer Muwallif noted "abrasions, minor abrasions to her neck area as well as to her face." *Id.* The officer concluded his investigation by taking her

statement, filling out a police report, and completing a "domestic violence purple sheet." *Id.* at 37.

[8] On May 29, 2012, the State charged Bellamy with: Count I, battery as a class C felony; Count II, criminal confinement as a class C felony; Count III, strangulation as a class D felony; Count IV, criminal confinement as a class D felony; Count V, intimidation as a class D felony; Count VI, domestic battery as a class A misdemeanor; Count VII, battery as a class A misdemeanor; and Count VIII, interference with reporting a crime, a class A misdemeanor. The State also filed an information alleging that Bellamy was an habitual offender. A jury trial was held on October 30, 2014, at which Griffin, Sara, and Officer Muwallif testified to the foregoing.

[9] During Sara's direct examination, the State introduced the 911 calls made by Griffin and the phone call Sara made to the police on April 25, 2011. Bellamy did not object to the admission of the 911 calls, but objected to the admission of Sara's call. Specifically, Bellamy's counsel argued: "I know there is a 911 exception, but from what she's describing – it was simply handled by their facilities, but it was not an emergency call. So I think it falls outside that rule to allow it in and that's not a true 911 call. It's not an emergency call." *Id.* at 75. Defense counsel also stated: "I think it would be bolstering of her testimony. She's already here and she's testified." *Id.* at 76. The prosecutor argued that defense counsel's argument goes to the weight and not the admissibility of the evidence. The court overruled the objection.

[10]     During her cross-examination, Sara testified that an officer came out the night of the physical encounter, she did not call the police that night, there was space separating her and Bellamy while the officer was present, she told the officer that nothing was wrong, she went to work in the morning, and that she did not communicate to law enforcement on the following day even though she had the option to do so. After cross-examination, the parties discussed playing the recording of Sara's phone call to the jury. Defense counsel argued that the recording of the phone call did not have the reliability expected in a 911 call of a person reacting to events as they unfold, was a form of hearsay, and would bolster the witness as a previous statement that she had made regarding the action. The prosecutor argued that the recording was a business record kept in the usual course and that it shows the information provided to police officers and the course of the investigation. The court reaffirmed its prior ruling, and the recording was played for the jury.

[11]     The State then called Nurse Lee to testify about her examination of Sara at Wishard Hospital. During her testimony, the State moved to admit certified medical records made by Nurse Lee while treating Sara. The following description of the incident was contained in the medical records:

> Pt states that on 4/22/2012 around 2330 Pt (Sara) husband grew angry about the tone she took over text message. Sara explains there was no tone, but rather just texted random things she had done around the house. Sara and her husband exchanged words, when she said "I hate you!" She then states that she can[']t remember the first blow. "He grabbed me then I grabbed him and ripped his shirt". Sara says husband said, "You hate me? Well, hate this, Bitch!" as husband ripped hair out of Sara's head. Sara explained that, "He choked

me!  He put both hands around my neck and stood over me.  (Sara begins to cry as she explains) . . . then he said, 'Bitch! Try to scream now!'"  Sara cries and says, "I thought he was going to kill me!"  Sara questions about cycle of violence.

State's Exhibit 12.

[12]  Defense counsel argued that the medical records constituted a "law enforcement type investigation," that it was hearsay, and that it "also fits into the realm of the Sixth Amendment right . . . ."  Transcript at 106.  The prosecutor argued that the witnesses testified on multiple occasions that the description of the altercation was obtained for the purposes of medical diagnosis and treatment.  Over Bellamy's objections, the court admitted the medical records.

[13]  Finally, Bellamy testified about the events of April 22, 2012.  He testified that the couple was arguing and that the argument became heated.  However, he testified that the incident only "got physical once [he] tried to come out of the bedroom with [his] bags."  *Id.* at 153.  He continued by saying that "she grabbed [his] jacket," and, while the two were "tussling," "the momentum took [them] to the floor."  *Id.* at 155-156.  He testified that, when they fell, he landed on her, and that he "knew it had to be painful, but that was not [his] intention."  *Id.* at 156.

[14]  The jury returned verdicts of guilty on Count III, strangulation as a class D felony, Count VI, domestic battery as a class A misdemeanor, and Count VII, battery as a class A misdemeanor.  Bellamy then pled guilty to Part II of Count

VI, thus elevating the domestic battery conviction to a D felony. He also admitted to being an habitual offender. The jury acquitted Bellamy on Counts I, II, IV, V, and VIII. The trial court then determined that Count VII merged into Part II of Count VI, and, accordingly, did not enter conviction on Count VII. The court entered judgments of conviction on Count III and Part II of Count VI. On November 10, 2014, the court sentenced Bellamy to three years on Count III, a sentence of four and one-half years on the habitual offender enhancement attached to his sentence on Count III, and to a concurrent three years on Part II of Count VI. Bellamy's total executed sentence is seven and one-half years to be served in the Department of Correction.

## *Discussion*

[15] The issue is whether the trial court abused its discretion in admitting certain evidence. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied.* We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied.* We may affirm a trial court's decision regarding the admission of evidence if it is sustainable on any basis in the record. *Barker v. State*, 695 N.E.2d 925, 930 (Ind. 1998), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied.*

Bellamy argues: (A) the trial court abused its discretion in admitting the recording of Sara's phone call to police and the certified medical records because they constitute hearsay; and (B) the medical records were needlessly cumulative and the admission of the phone call and medical records resulted in an improper drumbeat of repetition of the allegations.

A. *Hearsay*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 801(c). Hearsay is inadmissible unless admitted pursuant to a recognized exception. Ind. Evidence Rule 802; *see also Blount v. State*, 22 N.E.3d 559, 565 (Ind. 2014) ("Hearsay is an out-of-court statement offered for the truth of the matter asserted, and it is generally not admissible as evidence.") (internal citations and quotations omitted).

1. *Sara's Phone Call*

First, we address Bellamy's argument that Sara's phone call to police is inadmissible hearsay. Bellamy argues that Sara's phone call was offered solely to prove the truth of the matters asserted. The State argues that the phone call constitutes evidence of the course of the investigation conducted by the State and was not admitted to prove the truth of the matters asserted in the phone call.

Regardless of whether the phone call is inadmissible hearsay, we find that at most, the trial court's admission of the phone call would constitute harmless

error. We have stated previously that "[a]ny error caused by the admission of evidence is harmless error . . . if the erroneously admitted evidence was cumulative of other evidence appropriately admitted." *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004). We find that the recording of the phone call is merely cumulative of evidence properly admitted through the testimony of Sara, Nurse Lee, and Bellamy. *See Hennings v. State*, 532 N.E.2d 614, 615 (Ind. 1989) (holding that any error in admitting a recording of the victim's highly emotional call made immediately after rape was cumulative of the victim's testimony and therefore harmless); *Johnson v. State*, 699 N.E.2d 746, 749 (Ind. Ct. App. 1998) (holding that the error in admitting a recording was harmless because the recording was cumulative of prior testimony).

## 2. *The Certified Medical Records*

[20] Bellamy argues that the narrative portions of the medical records are hearsay that do not qualify under the medical records exception of Ind. Evidence Rule 803(4). The State argues that the medical records qualify under the hearsay exception of Ind. Evidence Rule 803(4).

[21] Ind. Evidence Rule 803(4) provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> * * * * *
>
> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>
> (A) is made by a person seeking medical diagnosis or treatment

(B) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and

(C) describes medical history; past or present symptoms, pain or sensations; their inception; or their general cause.

[22] This exception is "based upon the belief that a declarant's self-interest in seeking medical treatment renders it unlikely that the declarant would mislead the medical personnel person she wants to treat her." *Palilonis v. State*, 970 N.E.2d 713, 726 (Ind. Ct. App. 2012) (quoting *Miles v. State,* 777 N.E.2d 767, 771 (Ind. Ct. App. 2002)), *trans. denied*. There is a two-step analysis for determining whether a statement is properly admitted under Ind. Evidence Rule 803(4): "(1) whether the declarant is motivated to provide truthful information in order to promote diagnosis and treatment; and (2) whether the content of the statement is such that an expert in the field would reasonably rely upon it in rendering diagnosis or treatment." *Id.* (quoting *Nash v. State,* 754 N.E.2d 1021, 1023-1024 (Ind. Ct. App. 2001), *trans. denied*).

[23] The certified medical records fall under Ind. Evidence Rule 803(4) as the statements in the records describe "pain or sensations; their inception; or their general cause," were made to medical personnel while seeking medical treatment, and were made for, and were reasonably pertinent to, medical diagnosis or treatment. In his brief, Bellamy states that "[of] the narrative's 165 words, only the statements '[h]usband ripped hair out of Sara's head,' and '[h]e put both hands around my neck and stood over me' describe any of her alleged physical injuries." Appellant's Brief at 12. Thus, he appears to acknowledge

that these statements contained within the narrative fall under the medical records exception of Ind. Evidence Rule 803(4). *See Perry v. State,* 956 N.E.2d 41, 50 (Ind. Ct. App. 2011) (holding that "N.D.'s statements indicating she was 'grabbed . . . around the neck' and strangled were pertinent to the diagnosis and treatment of her physical injuries," and were admissible under Ind. Evidence Rule 803(4)). In *Perry*, we upheld the admission of medical records under Ind. Evidence Rule 803(4) where those records contained an identification of the alleged rapist and "statements indicating [the victim] was 'grabbed . . . around the neck' and strangled,'" because those statements were pertinent to the diagnosis and treatment of the victim's injuries. 956 N.E.2d at 50. We noted that in the case of sexual assault, the events of the assault can be highly relevant for treating the victim. *Id.* We also emphasized that in the case of sexual assault, the identity of the perpetrator is significant for the potential treatment for sexually transmitted diseases, how to discharge the patient, and any psychological counseling that may be necessary. *Id.*

[24] While this case differs from *Perry* in that the evidence presented did not reveal a sexual assault component to the attack, the reasoning in *Perry* is still applicable. Sara's identification of Bellamy as her attacker and her description of the events of the attack were highly important for making treatment decisions. At trial, Nurse Lee testified:

> Q: Okay. And why then, Jenny, is it important to get kind of that information from them about maybe their state of mind or their – not only just their physical information. Why is that important?
>
> A: For us to get medical diagnosis and assessment from the patient.

Q: Is it important when you're discussing what brought a patient in that day to also know if there is any perpetrator or suspect involved in that?

A: Oh, yeah, yeah.

Q: Okay.

A: That helps us determine maybe the kind of – the state of mind that they're in. Is this somebody that was a stranger and that the likelihood of them encountering this person is pretty minimal? Or is it somebody that they live with within the same home of and that they may be going into that home?

Q: And does that affect what resources you may provide to them?

A: Absolutely. It affects the resources I give them and it affects the timing of those resources. Some of these women do go right back into the home that they left.

Transcript at 99-100. As Nurse Lee testified, hearing Sara's description of the events and identification of her attacker were important for making a determination of what resources would be needed to provide a holistic treatment plan. Accordingly, we conclude that Sara's statements contained in the medical records which describe the attack and the perpetrator of the attack were made in the course of medical treatment and fall under the hearsay exception of Ind. Evidence Rule 803(4). *See Perry*, 956 N.E.2d at 50; *Nash*, 754 N.E.2d at 1025 ("[I]n cases such as the present one where injury occurs as the result of domestic violence, which may alter the course of diagnosis and treatment, trial courts may properly exercise their discretion in admitting statements regarding identity of the perpetrator."). In addition, to the extent

that some of the statements in the medical records may have exceeded the scope of the medical diagnosis exception, we conclude that any error in the admission of these nonmaterial statements was harmless. *See Perry*, 956 N.E.2d at 50 (concluding that any error in the admission of nonmaterial statements that may have exceeded the scope of the medical diagnosis exception and were left unredacted was harmless).

B. *Drumbeat Repetition*

[25] Finally, Bellamy argues that the trial court abused its discretion by admitting the phone call and the medical records because their admission resulted in a drumbeat of repetition that prejudiced the jury. In addition, he contends that the medical records should have been excluded as needlessly cumulative under Ind. Evidence Rule 403[1] because Sara testified at trial. The record reveals that he did not object to the admission of the records on that basis at trial. As we have stated previously, "a party may not present an argument or issue to an appellate court unless the party raised the same argument or issue before the trial court." *Washington v. State*, 840 N.E.2d 873, 880 (Ind. Ct. App. 2006) (quoting *Crafton v. State*, 821 N.E.2d 907, 912 (Ind. Ct. App. 2005)), *trans. denied*. Accordingly, we find that Bellamy has waived his argument under Ind. Evidence Rule 403. *See id.*; *Mendenhall v. State*, 963 N.E.2d 553, 567 (Ind. Ct. App. 2012) ("At trial, Mendenhall failed to object to DeLaney's testimony on

---

[1] Ind. Evidence Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

Rule 403 grounds. Failure to object to the admission of evidence at trial generally results in waiver and precludes appellate review unless its admission constitutes fundamental error."), *trans. denied*. Waiver notwithstanding, Bellamy's argument that the medical records were inadmissible as needlessly cumulative simply because Sara testified at trial is unpersuasive. *See State v. Velasquez*, 944 N.E.2d 34, 37-38, 42 (Ind. Ct. App. 2011) (finding victim's diagnosis and treatment records admissible under Ind. Evidence Rule 803(4) where the victim testified), *trans. denied*; *see also* Ind. Evidence Rule 803(4) ("The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness . . . (4) Statement Made for Medical Diagnosis or Treatment. . . .").

[26]     Bellamy cites to *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991), to support his argument that the admission of cumulative hearsay evidence is grounds for reversal. In *Modesitt*, the State presented the testimony of three lay witnesses who gave detailed recitations of the child victim's account before the child testified, and, as the Indiana Supreme Court noted, Modesitt "could not cross examine the [witnesses] concerning the truthfulness of the charges which had been leveled by [the victim]." *Modesitt*, 578 N.E.2d at 651. In that case, the Indiana Supreme Court observed that, by allowing the admission of these recitations "[p]rior to putting the victim on the stand, the victim's veracity had been, in essence, vouchsafed by permitting the three witnesses to repeat the accusations of the victim." *Id.* at 651. The Court concluded that "the drumbeat repetition of the . . . statements prior to calling the victim herself precluded

direct, immediate cross examination of the statements and constitutes error requiring reversal." *Id.* at 652.

[27] *Modesitt* is distinguishable from this case. Here, Sara testified, and Bellamy had the opportunity to cross-examine her before the phone call was played to the jury. Additionally, Nurse Lee testified prior to the admission of the certified medical records, and Bellamy had the opportunity to cross-examine her about the statements made in those records. Furthermore, the statements contained in the phone call and the medical records were brief, consistent with, and did not elaborate upon Sara's testimony. For these reasons, we conclude that the challenged evidence did not constitute drumbeat repetition of Sara's testimony requiring reversal and that any error made in admitting the phone call or medical records was harmless. *See, e.g.*, *McGrew v. State*, 673 N.E.2d 787, 796 (Ind. Ct. App. 1996) (holding that the improper admission of hearsay testimony from two witnesses whose testimony was "brief and consistent with" the victim's testimony did not "constitute drumbeat repetition of the victim's statements"), *summarily aff'd*, 682 N.E.2d 1289, 1292 (Ind. 1997); *Surber v. State,* 884 N.E.2d 856, 863-864 (Ind. Ct. App 2008) (finding that the admission of certain testimony the defendant argued constituted drumbeat repetition of the victim's statements was harmless error where the admitted testimony was brief, consistent with, and did not elaborate upon the victim's testimony and was made after the victim testified subject to cross-examination), *trans. denied.*

## *Conclusion*

[28] For the foregoing reasons, we affirm Bellamy's convictions.

Affirmed.

Friedlander, J., and Riley, J., concur.